IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AZARIAS S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AZARIAS S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JANN L., APPELLANT.

Filed November 27, 2018.    No. A-18-206.

Appeal from the Separate Juvenile Court of Lancaster County: TONI G. THORSON, Judge. Affirmed.

Candice C. Wooster, of Brennan & Nielsen Law Offices, P.C., for appellant.

Patrick Condon, Lancaster County Attorney, and Mary C. Norrie for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Jann L. appeals from the order of the separate juvenile court of Lancaster County adjudicating her son, Azarias S., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). We affirm.

BACKGROUND

Jann and Sylvester S. are the parents of Azarias (born in 2014). The record indicates that Jann and Sylvester are married, but they separated after the domestic incident that led to this juvenile petition being filed. Sylvester filed a notice of appeal regarding the adjudication (treated as a second notice of appeal since Jann filed her notice of appeal first), but he ultimately did not

- 1 -

file an appellate brief. Because Sylvester is not part of this appeal, he will only be discussed as necessary.

On May 25, 2017, law enforcement was dispatched to Jann and Sylvester's apartment after someone called to report a domestic altercation; Azarias was in the apartment when the altercation between his parents occurred. Jann was taken into custody as a result of the altercation, and in July, she pled guilty to and was convicted of third degree domestic assault, a Class I misdemeanor (amended from terroristic threats, a Class IIIA felony) in the county court for Lancaster County.

On August 8, 2017, the State filed a petition in the juvenile court alleging that Azarias was a child within the meaning of § 43-247(3)(a). In Count I of the petition, the State alleged that Azarias lacked proper parental care by reason of the fault or habits of Jann, and/or that he was in a situation injurious to his health or morals in that:

a) On or about May 25, 2017, Jann . . . intentionally and knowingly caused bodily injury to Sylvester . . . and/or threatened Sylvester . . . with imminent bodily injury, and/or engaged in a domestic violence confrontation with Sylvester . . . in the family home and/or in the presence of [Azarias]. Jann . . . and Sylvester . . . have a history of verbal and/or physical domestic confrontations in the family home and/or in the presence of [Azarias];

b) Jann . . . has failed to provide a safe and stable home for [Azarias];

c) The actions of Jann . . . and/or the above situation places [Azarias] at risk of harm; [and]

d) All events occurred in Lancaster County, Nebraska.

(Emphasis omitted.) In Count II of the petition, the State alleged that Azarias lacked proper parental care by reason of the fault or habits of Sylvester, and it set forth more specific allegations in that regard.

A contested adjudication hearing was held on November 13, 2017. In its order filed on February 1, 2018, the juvenile court found, as relevant to this appeal, that the allegations in Count I of the petition were true by a preponderance of the evidence. The court determined that Azarias was a child as defined by § 43-247(3)(a) and adjudicated him accordingly.

Jann appeals the juvenile court's order.

## ASSIGNMENTS OF ERROR

Jann assigns that the juvenile court erred when it found by a preponderance of the evidence that the allegations in Count I of the petition were true and adjudicated Azarias as a juvenile pursuant to § 43-247(3)(a).

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### GENERAL PRINCIPLES OF LAW

We begin by setting forth the general principles of law regarding adjudications.

> To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue 2016). Section 43-247(3)(a) outlines the basis for the juvenile court's jurisdiction and grants exclusive jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian."

> The purpose of the adjudication phase is to protect the interests of the child. The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. The State must prove such allegations by a preponderance of the evidence.

*In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 845-46, 910 N.W.2d 789, 798-99 (2018).

### TESTIMONY FROM ADJUDICATION HEARING

At the adjudication hearing, the State called three witnesses: two law enforcement officers and an employee of the Nebraska Department of Health and Human Services. Neither Jann nor Sylvester testified at the hearing. A certified copy of Jann's criminal conviction related to the May 2017 incident was received without objection.

Mark Hefley is a police officer with the Lincoln Police Department. On May 25, 2017, he was dispatched to an apartment on Fletcher Avenue at 4 or 4:30 a.m. The reporting party had heard a male and female screaming in front of the apartment, believed it was a domestic violence situation, and called the police. While the officers were in route, "the reporting party articulated that the male party had said, 'Stab me.'" When Officer Hefley arrived on scene, he and Officer Nitz knocked on the door of the apartment and initiated contact with Jann and Sylvester. Jann was holding Azarias; Officer Hefley did not believe that Azarias was crying, upset, or harmed in any way. Jann was also pregnant.

Officer Hefley spoke to Sylvester outside of the apartment. Officer Hefley gave the following account of his conversation with Sylvester. Sylvester said that he and Jann were in a verbal altercation and at one point Sylvester tried to leave. Jann "had his phone so they were engaged in a disturbance with him trying to obtain the phone back." During Sylvester's attempt to get the phone back, Jann threw the phone. Sylvester said there was a little bit of a shoving match between the two of them. According to Officer Hefley, the phone incident occurred in the kitchen/living room area, and Jann was holding Azarias during the incident.

Officer Hefley testified he then spoke with Jann inside the apartment while Officer Nitz stayed with Sylvester. Officer Hefley stated that Jann told him that the disturbance started when Sylvester was trying to leave the residence and she did not want him to leave. At that point, Officer Hefley "noticed that one of the bedroom doors was completely destroyed and off the hinges"; the

door was "pretty dismembered from the actual frame." He asked Jann to "go into detail" about what happened to that door. Jann "admitted that she was trying to get at [Sylvester]." When asked to elaborate, Jann said "she was trying to hurt him like he hurts her." Officer Hefley noticed "some puncture wounds, puncture marks in the door." When he asked Jann what those were from, "she said at that point that she was actually armed with a kitchen knife."

Officer Hefley testified that the bedroom with the broken door "was the child's bedroom," and that Jann had grabbed the knife and attempted to go into the bedroom; she told Officer Hefley that she tried to force entry into the child's bedroom. According to Officer Hefley, Jann "articulated that she told [Sylvester], 'Swing on me again and when you do so, I'm going to basically swing back with these knives.'" Officer Hefley stated that when he noticed a cut to Jann's lip, Jann said that she had been struck by Sylvester.

Officer Hefley then spoke to Sylvester again. According to Officer Hefley, Sylvester was initially "a little reluctant" to elaborate further on what had happened but eventually said that "he had barricaded himself inside that bedroom when [Jann] had grabbed the knife and attempted to go into the bedroom"; Sylvester told Officer Hefley he felt threatened. Sylvester also said Jann caused the damage to the door. On cross-examination, Officer Hefley said that Sylvester "did not believe [Jann's] intent was to harm him that morning." Officer Hefley did not believe that either Jann or Sylvester told him where the child was at during the altercation involving the knife.

Officer Hefley testified that Jann was placed into custody. When Jann was taken into custody, Azarias was turned over to Sylvester. Sylvester was not cited for domestic violence related to the cut on Jann's lip, nor was he cited for child abuse.

Officer Hefley was asked, "Based on your training and experience, are children placed at risk of harm when they're present for domestic violence?" He responded, "More than the physical aspect of it, the mental aspect of it, absolutely." "Sometimes the kids don't get the physical aspect of it, they're more or less unfortunate witnesses to the occurrences." "Witnessing the physical violence that occurs in a home can obviously be very traumatic for a child to have to witness." He was asked "if a child is present, could they physically be harmed?" He responded, "Potentially." Officer Hefley said "[i]t's hard to make [a] determination" as to whether Azarias is at risk of harm, but he "potentially" could be at risk.

Jason Goodwin is a police sergeant with the Lincoln Police Department. On May 25, 2017, he responded to the call at Jann and Sylvester's apartment; the "call came out at 3:45 a.m." Sergeant Goodwin testified that Officers Hefley and Nitz arrived at the scene "several minutes" before he did, and that when he arrived Officer Nitz was outside with Sylvester. Sergeant Goodwin heard Sylvester

> describing that he was arguing with . . . Jann . . . . He said that he was trying to find a ride to get away from the residence. She locked out his phone. They had an argument over that. He asked her for the phone or for a different phone. At some point, he reported that she threw the phone down and broke it. He then described that she came towards him; that he had his hand on her face and kind of pushed her away at which point he said he retreated back to [their] bedroom.

Sylvester said, "At some point, she retrieved a knife." According to Sergeant Goodwin, at that point Sylvester "became very vague."

When Sergeant Goodwin went inside the apartment, Jann was speaking with Officer Hefley. Sergeant Goodwin testified that Jann made the comment, "'I lost it,'" and she admitted to getting the knife and to stabbing the door and breaking down the door. (On cross-examination, Sergeant Goodwin said he believed that Azarias was "in his own room," not the parent's bedroom where the door was stabbed and the doorjamb was broken away from the wall.) Then Jann said, "'At least I stuck up for myself this time.'" Sergeant Goodwin asked Jann about any history of domestic violence, and she made the comment, "behind closed doors[.]" Jann said that Sylvester had assaulted her in the past and that she had not reported it. There was no indication of when, or how many, prior incidents occurred. Exhibit 2 (photos Sergeant Goodwin took of Jann's injury and the damaged apartment door) was received into evidence without objection.

When asked if he believed Azarias was at risk of harm during this incident, Sergeant Goodwin responded, "I believe definitely emotionally. I don't know if he was in the middle of the actual physical altercation. But for certain, he was present and it was a dangerous situation." During questioning about a child's risk of harm once an incident is over, Sergeant Goodwin said, "Because there's a history and here we are yet again out on another incident," there is a risk of harm. On cross-examination, Sergeant Goodwin acknowledged that this was his first experience at this residence. But on redirect, Sergeant Goodwin agreed that Jann did indicate a history of domestic violence.

Jayme Smock is a child and family services specialist with the Nebraska Department of Health and Human Services. She is an initial assessment worker and investigates allegations of abuse and neglect. Smock testified that she received a report about the May 2017 incident and she spoke with Jann on June 22. Smock recounted her conversation with Jann as follows. Jann reported that she and Sylvester were arguing over a cell phone. She "went to remove an account off of a phone that was in Azarias's bedroom and a physical altercation transpired" when Sylvester came into the bedroom to try to get the cell phone and knocked it out of her hand; Azarias was in the bedroom during the incident. Jann shoved Sylvester, and then he hit her causing injury to her mouth. "[Jann] indicated that she went to the kitchen to grab a knife in order to scare him." Jann told Smock that she did not intend to harm Sylvester. Smock acknowledged that inconsistent reports by Jann as to whether she intended to harm Sylvester (Jann told Officer Hefley she intended to harm Sylvester) is concerning because "there could be inaccurate information" "or not knowing exactly what happened that night."

Smock asked Jann if there was a history of domestic violence between her and Sylvester. Jann stated that they had an unreported history of domestic violence, and that they would engage in a physical altercation approximately one time per year; but she also told Smock about an incident that occurred 1 to 2 months prior to the May 2017 incident. Jann reported that in the earlier incident, she and Sylvester engaged in an argument and that he threw a laptop at her that hit her in the leg; Jann also said that Sylvester stood over her to intimidate her and it made her feel weak.

Smock testified that she has a domestic violence intake "[a]t least once a week." According to Smock, if a child is present for domestic violence, he or she is placed at risk of harm. She stated, "It can place them at physical risk of harm. They can become involved in the altercation or if they are present they can be injured as a result of an altercation between the other two people." "They can also be affected emotionally. Effects of domestic violence can cause trauma to children and can also potentially cause mental health and developmental issues later on during their life."

As part of the initial intake, Smock completed a risk assessment, which "determines a level of risk that the family is at when you complete the investigation. That determines if the family should receive ongoing services through the Department or if the case should close." The following is a colloquy between Smock (answering) and Jann's attorney (asking the questions).

Q And what type of ongoing services are typically offered?

A Typically, we offer family support, any evaluations that may be necessary. It just varies depending on the case. Parenting classes.

Q It depends on the type of allegations in the intake?

A Correct.

Q And so what -- what would be a reason for offering ongoing services?

A To correct any issues that are present or reduce the level of risk that the family is currently at.

Q And that's a risk of future harm to the child?

A Correct.

Q And so what would be a reason for not offering ongoing services?

A If the family scored low or moderate on a risk assessment.

When she completed her risk assessment in June 2017, Smock determined that the risk level of this case was "[m]oderate," and her recommendation was to close the case. At the time Smock completed her assessment, Jann and Sylvester were not living together. Jann indicated that they were separated and she planned to file for divorce; she did not say when she planned to file and indicated that there were financial barriers.

According to Smock, a new intake was accepted due to the filing of the juvenile petition, but Smock was not aware of any intakes due to a new incident. Smock was asked, "[B]ased on what you've learned about the case between [Jann] and [Sylvester], do you believe there's a future risk of harm to Azarias . . . ?" She responded, "No, I do not believe he's at future risk of harm."

Acknowledging Officer Hefley's testimony that Jann was pregnant during the May 2017 incident, Smock said that Jann has had that baby and Jann reported that Sylvester is the father. Smock also acknowledged that Jann and Sylvester will have to coparent their children.

### SUFFICIENCY OF EVIDENCE FOR ADJUDICATION

As stated earlier in this opinion, to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). And while the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* In Count I of the petition, the State alleged that Azarias was a child within the meaning of § 43-247(3)(a) because he lacked proper parental care by reason of the fault or habits of Jann, and/or that he was in a situation injurious to his health or morals. The State further alleged, in relevant part, that Jann threatened Sylvester with imminent bodily injury, and/or engaged in a domestic violence confrontation with Sylvester in the family home and/or in the presence of Azarias; that Jann failed

to provide a safe and stable home for Azarias; and that the above situation placed Azarias at risk of harm.

There is no dispute in the evidence that Jann and Sylvester got into an altercation over a cell phone and that Azarias was present in the room during that altercation. By Jann's own report to Smock, during the cell phone portion of the incident, Jann shoved Sylvester and then he hit her, causing injury to her mouth. There is also no dispute that Jann then got a knife and attempted to get into a bedroom where Sylvester had "barricaded himself," and a door and door frame were significantly damaged in the process (the pictures that we have reviewed show such damage); the record is not clear where exactly Azarias was in the apartment during that portion of the altercation, but there is no dispute that he was in the apartment. Although Jann told Smock that she grabbed a knife to scare Sylvester but did not intend to hurt him, Officer Hefley testified that Jann told him that "she was trying to hurt [Sylvester] like he hurts her" and that she reported telling Sylvester, "'Swing on me again and when you do so, I'm going to . . . swing back with these knives.'"

Officer Hefley and Smock both testified that if a child is present for domestic violence that the child is at risk of harm, both physically and emotionally. And Officer Goodwin testified that Azarias was "definitely emotionally" at risk of harm during the May 2017 incident. As to Azarias' risk of future harm, Officer Hefley could not make a determination. Smock testified that she did not believe Azarias was at risk of future harm. However, during questioning about a child's risk of harm once an incident is over, Sergeant Goodwin said, "Because there's a history and here we are yet again out on another incident," there is a risk of harm. On cross-examination, Sergeant Goodwin did acknowledge that this was his first experience at this residence. But both Sergeant Goodwin and Smock testified that Jann revealed a history of domestic violence between her and Sylvester and that Jann stated most of it was unreported; in fact, this May incident was not reported by either Jann or Sylvester, it was a third party who reported hearing a male and female screaming in front of the apartment. Believing it to be a domestic violence situation, the third party called the police. And Smock testified that Jann told her that she (Jann) and Sylvester would engage in a physical altercation approximately one time per year, but Jann also told Smock about an incident that occurred 1 to 2 months prior to the May 2017 incident. It is true that we do not know exactly how many instances of domestic violence have occurred between Jann and Sylvester, but we know that the May incident was not the first, and it was not even the first that year. And during the May incident, Azarias was in the apartment when his parents were shoving and hitting each other, and when Jann grabbed a knife in an attempt to at least scare, if not harm, Sylvester. Even though Jann and Sylvester separated after the May incident, and Jann plans to file for divorce, continued contact between them is likely in order for them to coparent Azarias and his sibling. And Jann and Sylvester's reluctance to report the violence imposed upon them by the other would seem to heighten the risk to Azarias.

Jann cites us to three cases to support her position that Azarias is not at risk of harm. However the cases she relies on involve whether a parent's drug or alcohol use (or in one case, mere possession) puts a child at risk of harm; such cases are distinguishable from the instant case where domestic violence, with physical injuries and property damage, occurred while the child was present in the home and there was a self-reported history of domestic violence. Based on our de novo review of the record, we find by a preponderance of the evidence that Azarias is at definite

risk of future harm. We also find by a preponderance of the evidence that Azarias was a child within the meaning of § 43-247(3)(a).

## CONCLUSION

For the reasons stated above, we find there was sufficient evidence to prove the allegations in Count I of the petition and to adjudicate Azarias pursuant to § 43-247(3)(a). We therefore affirm the juvenile court's adjudication order.

AFFIRMED.