Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/04/2018 08:08 AM CDT

In re Interest of Kane L., a child
under 18 years of age.
State of Nebraska, appellee, v. Angela L.,
appellant, and Scott L., appellee.

In re Interest of Carter L., a child
under 18 years of age.
State of Nebraska, appellant and cross-appellee,
v. Angela L., appellee and cross-appellant.

___ N.W.2d ___

Filed May 4, 2018.    Nos. S-17-720, S-17-775.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.

2. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.

3. **Trial: Evidence: Appeal and Error.** An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion.

4. ____: ____: ____. Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews a trial court's ruling on authentication for abuse of discretion.

5. **Parental Rights: Due Process.** The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection. Such due process rights include the right to be free from an unreasonable delay in providing a parent a meaningful hearing after the entry of an ex parte temporary custody order.

6. **Criminal Law: Trial: Evidence.** Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.

7. \_\_\_\_: \_\_\_\_: \_\_\_\_. Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue.

8. **Trial: Evidence: Appeal and Error.** Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis. An appellate court's review concerning the admissibility of such evidence is for an abuse of discretion.

9. **Parental Rights.** The purpose of the adjudication phase is to protect the interests of the child.

10. **Juvenile Courts: Jurisdiction: Parental Rights: Proof.** The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. The State must prove such allegations by a preponderance of the evidence.

Appeals from the County Court for Buffalo County: John P. Rademacher, Judge. Judgment in No. S-17-720 affirmed. Judgment in No. S-17-775 reversed, and cause remanded for further proceedings.

Elizabeth J. Chrisp, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for Angela L., appellant in No. S-17-720 and appellee in No. S-17-775.

Mandi J. Amy, Deputy Buffalo County Attorney, for State of Nebraska, appellee in No. S-17-720 and appellant in No. S-17-775.

Vikki S. Stamm, of Stamm, Romero & Associates, P.C., L.L.O., guardian ad litem.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, and Funke, JJ., and Strong, District Judge.

Heavican, C.J.

## INTRODUCTION

Kane L. and Carter L. were removed from the family home as a result of methamphetamine use by their mother, Angela L., and their father, Scott L. The county court for Buffalo County, sitting as a juvenile court, adjudicated Kane but not Carter. In separate appeals, Angela challenged Kane's adjudication and certain rulings of the juvenile court with respect to the petition seeking to adjudicate Carter. The State, acting through the Buffalo County Attorney's office, appealed the juvenile court's failure to adjudicate Carter. We affirm the juvenile court's order adjudicating Kane and reverse the juvenile court's order declining to adjudicate Carter, and remand the cause for further proceedings.

## BACKGROUND

Angela is the mother of Carter, born in September 2000, and Kane, born in September 2008. Carter and Kane's biological father is Scott. Scott and Angela are also biological parents to Lily L. Lily was 19 years old at the time of these proceedings. As such, Lily is not involved in these juvenile court actions, although placement of Kane and Carter was with her for a period of time.

In January 2017, Angela gave birth to another boy. Scott is not the biological father of this child. Angela sought to utilize Nebraska's "Safe Haven" law[1] with regard to the baby; this child's placement is also not at issue in these juvenile court actions.

Angela provided a urine sample at the time of her admission to the hospital prior to the baby's birth, and that sample tested positive for drug use. Later, the baby's "cord blood" tested positive for methamphetamine, amphetamine, "THC," and oxycodone. Law enforcement was then contacted, because of the following: Angela wished to relinquish the baby, the positive

---

[1] Neb. Rev. Stat. § 29-121 (Reissue 2016).

drug screen, and the hospital social worker's knowledge that Angela had other children at home.

The Department of Health and Human Services and law enforcement first contacted Angela. She admitted to using methamphetamine and marijuana during her pregnancy, including methamphetamine 3 to 4 days before giving birth and marijuana within a day or so of giving birth. Angela insisted that she had never used drugs in the family home and that Scott did not use methamphetamine. Angela declined to give permission for Kane to submit to drug testing.

The Department of Health and Human Services and law enforcement then made contact with Scott and Kane. At this time, Carter was on juvenile probation and was at a juvenile detention center. Scott denied methamphetamine use and, after a few days, gave consent for Kane to be tested.

Toenail testing was done on Kane, and an initial positive result for both THC and methamphetamine was returned. The sample was insufficient to test further for the presence of THC, but the presence of methamphetamine was confirmed by a second test. The presence of methamphetamine, but not amphetamine, suggests that Kane's exposure was environmental in nature.

Scott was eventually tested. His saliva test was initially returned as a presumptive positive for methamphetamine. Scott indicated surprise at this result and stated that he had not used methamphetamine in a week. Scott later indicated that he had not used in the last 4 days. This presumptive positive test was sent in for laboratory testing and eventually tested negative. There was evidence in the record that the sample was initially returned to the organization that gathered the sample, because the wrong type of vial had been used, and that the organization had to "buy new vials and put the saliva into the vial and resend it." Further testing was apparently not sought at the time, because Scott had admitted to methamphetamine use.

As a result of the safety concerns presented by both Angela's and Scott's use of methamphetamine, arrangements were made to place Kane and Carter, who had just returned to the family home, with Lily. The children were later moved to a placement with their maternal grandparents.

The county filed a motion for temporary custody that was granted ex parte on February 17, 2017. The petition to adjudicate was filed on February 21—the next business day following the Presidents Day court holiday. The record indicates that at least Scott was present when Kane and Carter were removed. The record further indicates that Scott and Angela had input into the initial placement of the children with their oldest daughter, Lily, and had visitation with the children throughout, initially in the family home.

Over the next few days, before the first scheduled hearing on March 8, 2017, counsel was appointed for Scott and Angela. On March 1, both Scott and Angela filed answers, through counsel, denying the allegations set forth in the petition to adjudicate.

While the first hearing was scheduled to be held March 8, 2017, it was actually held on March 1. The journal entry for that hearing reflects that Scott and Angela were present without counsel and were shown a rights advisory video. No bill of exceptions for that hearing is in the record. A later journal entry, entered June 21, indicated that a protective custody and detention hearing had been scheduled for March 1 as well, but that this hearing was waived by Scott's and Angela's respective counsel as counsel sought to conduct more discovery and indicated Scott or Angela would motion for such a hearing if it was desired.

Various motions were filed by all parties, and multiple hearings were held in the time leading up to the first adjudication hearing held May 15, 2017, and eventual adjudication on June 30. There is no bill of exceptions in the appellate record for those hearings.

Angela appeals from Kane's adjudication. The county attorney appeals and Angela cross-appeals from the order denying the petition to adjudicate Carter. Scott filed a notice of appeal from Kane's adjudication, but did not further participate.

## ASSIGNMENTS OF ERROR

*Appeal in Case No. S-17-720,*
In re Interest of Kane L.

On appeal, Angela assigns that the juvenile court erred in (1) not ordering a protective custody and detention hearing, thus denying Angela due process; (2) admitting evidence of the baby's cord blood test and Kane's toenail test, because the county failed to establish a foundation for those results; and (3) finding sufficient evidence to support adjudication.

*Appeal in Case No. S-17-775,*
In re Interest of Carter L.

On appeal, the county attorney assigns that the juvenile court erred in not adjudicating Carter.

On cross-appeal, Angela assigns that the juvenile court erred in (1) not ordering a protective custody and detention hearing, thus denying Angela due process, and (2) admitting evidence of the baby's cord blood test and Kane's toenail test, because the county failed to establish foundation for those results.

## STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[2] When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other.[3]

---

[2] *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017).

[3] *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016).

[2] The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.[4]

[3] An appellate court reviews the trial court's conclusions with regard to evidentiary foundation for an abuse of discretion.[5]

[4] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated.[6] An appellate court reviews a trial court's ruling on authentication for abuse of discretion.[7]

## ANALYSIS

*Pretrial Hearing.*

Angela contends, on both appeal and cross-appeal, that her due process rights were violated when a protective custody and detention hearing was not held.

[5] The proper starting point for legal analysis when the State involves itself in family relations is always the fundamental constitutional rights of a parent.[8] The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by the U.S. Supreme Court.[9] The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection.[10] Such due process rights include the right to be free from an unreasonable delay in providing a parent a meaningful hearing after the entry of an ex parte temporary custody order.[11]

---

[4] *In re Interest of Joseph S. et al.*, 288 Neb. 463, 849 N.W.2d 468 (2014).

[5] *Midland Properties v. Wells Fargo*, 296 Neb. 407, 893 N.W.2d 460 (2017).

[6] *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016).

[7] *Id.*

[8] *In re Interest of Carmelo G., supra* note 2.

[9] *Id*.

[10] *Id.*

[11] See *id.*

Neb. Rev. Stat. § 43-248(2) (Reissue 2016) allows the State to take a juvenile into custody without a warrant or order of the court when it appears the juvenile "is seriously endangered in his or her surroundings and immediate removal appears to be necessary for the juvenile's protection." However, the parent retains a liberty interest in the continuous custody of his or her child.[12] An ex parte order authorizing temporary custody with the Department of Health and Human Services is permitted because of its short duration and the requirement of further action by the State before custody can be continued.[13] But "'the State may not, in exercising its parens patriae interest, unreasonably delay in notifying a parent that the State has taken emergency action regarding that parent's child nor unreasonably delay in providing the parent a meaningful hearing.'"[14] Therefore, following the issuance of an ex parte order for temporary immediate custody, "'[a] prompt detention hearing is required in order to protect the parent against the risk of an erroneous deprivation of his or her parental interests.'"[15]

In *In re Interest of R.G.*,[16] we recognized that parents have a due process right to be free from an unreasonable delay in providing the parents a meaningful hearing after an ex parte order for immediate custody is filed. We concluded that the mother's due process rights were not violated by a 14-day delay between the entry of an ex parte order and that of a detention order when she was given an opportunity to be heard at the detention hearing and was allowed to visit her children in the interim, but cautioned that this 14-day delay

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 813-14, 896 N.W.2d at 908 (emphasis omitted).

[15] *Id.* at 814, 896 N.W.2d at 908.

[16] *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780 (1991), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998).

between the ex parte order and detention hearing was "on the brink of unreasonableness."[17]

In *In re Interest of Carmelo G.*,[18] we held that a delay of 8 months between an ex parte order and one following a protective custody hearing violated a mother's due process rights, even though the mother met with her caseworker during that time, was represented by counsel, and various hearings were held and continuances granted with no objection by her counsel.

In this case, the motion for temporary custody was granted ex parte on February 17, 2017. The petition to adjudicate was filed on February 21—the next business day following the Presidents Day court holiday. The record shows that at least Scott was present when Kane and Carter were removed and that Scott and Angela had input into the initial placement of the children with their oldest daughter, Lily, and had visitation with the children throughout, initially in the family home.

Over the next few days before the first scheduled hearing on March 8, 2017, counsel was appointed for Scott and Angela. On March 1, both Scott and Angela filed answers through counsel denying the allegations set forth in the petition to adjudicate.

While the first hearing was scheduled for March 8, 2017, the record shows that it was actually held on March 1. The journal entry for that hearing reflects that Scott and Angela were present without counsel and shown a rights advisory video. No bill of exceptions for that hearing is in the record. A later journal entry, entered on June 21, indicated that a protective custody and detention hearing had been scheduled for March 1 as well, but that it was waived by counsel, who sought to conduct more discovery and would motion for such a hearing if it was desired.

---

[17] *Id*. at 423, 470 N.W.2d at 792.

[18] *In re Interest of Carmelo G., supra* note 2.

Various motions were filed by all parties and multiple hearings held in the time leading up to the first adjudication hearing on May 15, 2017, and eventual adjudication on June 30. There is no bill of exceptions in the record for those hearings, but from the journal entries following those hearings, it does not appear that detention or custody was at issue in any of them.

On these facts, we find no due process violation. The record shows that Angela was almost immediately appointed counsel and that counsel entered a denial of the allegations in the petition within a few days of being appointed. A March 1, 2017, journal entry indicates that Angela was informed of all of her rights, including the right to the hearing she now argues she did not receive. A later journal entry, entered on June 21, indicates that Angela waived her right to such a hearing. There is no indication from the record before us that Angela ever sought any further hearing. Nor does Angela deny that the June 21 journal entry accurately sets forth the events surrounding that March 1 hearing.

The cases cited by Angela in support of her conclusion that she was denied due process are inapplicable. In *In re Interest of Carmelo G.*, the mother clearly sought a detention hearing, and while one was held, it took approximately 7 months and five separate hearings to receive all of the evidence, and an additional 49 days for the court to issue its detention order following the receipt of evidence. In this case, the only evidence in the record was that both Scott and Angela were offered a detention hearing on March 1, 2017, but waived the hearing and never sought another one. There is no merit to this assignment of error.

*Foundation for Cord Blood*
*and Toenail Tests.*

Angela argues that the juvenile court erred in admitting the results from the cord blood and toenail tests, because the county did not establish proper foundation for the testing.

Specifically, Angela notes that the county did not establish a chain of custody for the cord blood and toenail tests. We note, as did the district court, that Angela does not argue that her Sixth Amendment right to confrontation was violated with regard to the admission of these test results.

[6-8] Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.[19] Objects which relate to or explain the issues or form a part of a transaction are admissible in evidence only when duly identified and shown to be in substantially the same condition as at the time in issue.[20] It must be shown to the satisfaction of the trial court that no substantial change has taken place in an exhibit so as to render it misleading.[21] Important in determining the chain of custody are the nature of the evidence, the circumstances surrounding its preservation and custody, and the likelihood of intermeddlers tampering with the object.[22] Whether there is sufficient foundation to admit physical evidence is determined on a case-by-case basis.[23] Our review concerning the admissibility of such evidence is for an abuse of discretion.[24]

With respect to the toenail test, Angela argues that while the person who collected the sample and the director of the laboratory that did the testing both testified, there was no testimony from the individual who actually conducted the test, and that such is insufficient to show foundation for the admissibility of the results. We disagree.

[19] *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] See *id.*

The individual who collected the sample testified at the hearing as to the procedures she followed when collecting the toenail sample. That individual indicated that she packaged the sample properly and mailed it to the testing laboratory. And the director of that laboratory testified as to the procedures followed at the laboratory, including the receipt of the sample and its testing. Given this testimony, we cannot conclude that the juvenile court abused its discretion in determining that "no substantial change ha[d] taken place in an exhibit so as to render [the results] misleading"[25] and in admitting the results.

There is no merit to Angela's contentions regarding the toenail testing.

With respect to the cord blood test, Angela contends that the doctor who ordered the test testified, but no one testified to the collection of the sample or to the test procedure itself. We need not address this assertion, because even assuming that the evidence establishing the chain of custody for the cord blood was insufficient, the admissibility of those results, on these facts, was not reversible error.

The cord blood test results were relevant to show that Angela had used drugs, notably methamphetamine. Angela's hospital drug screen was positive, and she admitted to the use of methamphetamine. As such, any error in admitting the positive cord blood test results was harmless.

*Error in Adjudicating Kane.*

Angela also assigns that the juvenile court erred in adjudicating Kane. She contends that the county failed to show an evidentiary nexus between the use of methamphetamine and a risk of harm that would support adjudication.

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of Neb. Rev. Stat. § 43-247 (Reissue

<hr>

[25] See *id.* at 431, 803 N.W.2d at 783.

2016).[26] Section 43-247(3)(a) outlines the basis for the juvenile court's jurisdiction and grants exclusive jurisdiction over any juvenile "who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian."

[9,10] The purpose of the adjudication phase is to protect the interests of the child.[27] The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction.[28] While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm.[29] The State must prove such allegations by a preponderance of the evidence.[30]

The results of Kane's toenail testing show that Kane has been environmentally exposed to methamphetamine. This suggests that either Scott or Angela, or both, have used the drug around Kane. Several witnesses specifically testified that Scott's and Angela's use of methamphetamine was a safety concern. This was sufficient to create the nexus that Angela claims is missing.

The State has proved that Kane is a child under § 43-247(3)(a) because of his parents' methamphetamine use. This creates a safety concern for Kane's being in the family home and suggests that Kane should be removed from parental placement and custody until the situation is safe for Kane to return.

There is no merit to this assignment of error.

*Error in Not Adjudicating Carter.*

The county assigns, in its appeal from the juvenile court's failure to adjudicate Carter, that it was error to not adjudicate

---

[26] *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013).

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] See *id.*

Carter, because he was exposed to the same threat of present harm as Kane.

It is true, as the juvenile court noted, that Carter was in a detention center during the events immediately leading up to the adjudication in this case. But Carter returned shortly before the children were removed from the home. The concern leading up to that removal and later adjudication was that it was unsafe for the children to be in the home at that time and into the future. The fact that Carter was not in the home in the immediate past has no bearing on whether he would be exposed to harm in Scott and Angela's care going forward.

We further note that there is testimony from law enforcement at the hearings in these cases that Carter was placed on probation in part because of positive drug screens of his own. Given that the reason for adjudication is alleged to be parental drug use, such testimony further supports Carter's adjudication.

The State must establish that without intervention, there is a definite risk of future harm; on these facts as established by the State, it has met that burden. We therefore conclude that the juvenile court erred in not adjudicating Carter.

## CONCLUSION

In case No. S-17-720, the decision of the juvenile court adjudicating Kane is affirmed. In case No. S-17-775, the decision not adjudicating Carter is reversed and the cause is remanded for further proceedings.

JUDGMENT IN NO. S-17-720 AFFIRMED.
JUDGMENT IN NO. S-17-775 REVERSED, AND CAUSE REMANDED FOR FURTHER PROCEEDINGS.