IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF GEONNI G. & KELSEY G.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF GEONNI G. AND KELSEY G.,
CHILDREN UNDER 18 YEARS OF AGE.


STATE OF NEBRASKA, APPELLEE,

V.

CRYSTAL G., APPELLANT.


Filed September 10, 2019.     No. A-18-823.


Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER E. KELLY, Judge. Affirmed.

Nicole L. Cavanaugh, of Law Office of Nicole L. Cavanaugh, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Shinelle L. Pattavina for appellee.


PIRTLE, ARTERBURN, and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

Crystal G. appeals from an order of the separate juvenile court of Douglas County adjudicating her children, Geonni G. and Kelsey G., as minors under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and an order denying her motion for supervised visitation. Based on the reasons that follow, we affirm the juvenile court's orders.

## II. BACKGROUND

Crystal is the biological mother of Geonni and Kelsey, who were ages 7 and 15, respectively, at the time of the hearing in this matter. On February 14, 2018, the State filed a

petition to adjudicate the children as minors pursuant to § 43-247(3)(a). The State alleged that Crystal's drug and alcohol use placed the children at risk for harm, that Crystal had failed to provide for the children's daily needs, that Crystal lived with a man named Jason who was the subject of an open juvenile court matter that precluded his children from placement in his home, that Crystal had failed to provide proper parental care, support, supervision, and/or protection for the children, and that the children were at risk for harm due to the aforementioned.

On July 27, 2018, an adjudication hearing was held. The State offered testimony from three witnesses: Kelsey; a family permanency specialist; and a Nebraska Department of Health and Human Services (DHHS) initial assessment worker. No other witnesses were called by any party. Kelsey testified on the record in chambers with counsel for all parties present.

Kelsey lived in Crystal's home until the end of January 2018, when Crystal instructed her to either go to Jason's home and act respectfully toward him or move out and begin living with her father. Kelsey moved in with her father and her grandparents in their home. When Kelsey moved out of Crystal's home, she was worried about Geonni's well-being because she had been caring for him until then. Kelsey testified that she woke up Geonni in the mornings and got him dressed for school. Either Crystal or Jason would pick up the children after school and drop them off at home. When they got home after school on nights that Kelsey did not have show choir rehearsal, she watched Geonni until Crystal and Jason returned around 7 p.m. Kelsey said that Crystal provided dinner for them. Approximately three times weekly, Crystal and Jason would leave again around 10 p.m. and not return until around 4 the next morning, leaving Kelsey to watch Geonni during those times. If there was an emergency, Kelsey could call Crystal, but Kelsey testified that Crystal's cell phone was often dead or turned off. However, on occasions when Kelsey called Crystal to return home and Crystal's phone was charged, Crystal did return home.

Kelsey testified that she had concerns regarding Jason, who she described as Crystal's boyfriend. According to Kelsey, Jason taught Geonni gang signs and walked with a "pimp stick." Kelsey said Jason was at their home every day and night. He had a key to the home and kept many of his belongings there. Crystal told Kelsey that Jason was not allowed to live with his children per court order, and Kelsey said that Crystal was "[c]ompletely aware" of Jason's juvenile court case. When Kelsey told Crystal that she did not feel comfortable with Jason always being in the home, Crystal told Kelsey that she "didn't care how [Kelsey] felt about it."

In addition to Jason, Crystal also had other friends living in the home or visiting often, according to Kelsey. Crystal told Kelsey that one of her friends who visited the home was the "most wanted in Sarpy County." When Kelsey told Crystal that she did not feel comfortable living with people who had outstanding warrants, Crystal "didn't care" and said that it "wasn't [Kelsey's] decision."

Kelsey was concerned that Crystal, Jason, and their friends were doing drugs in the home. Kelsey said that she saw pipes throughout the home and described them as glass tubes with balls at the bottom, but she saw nothing inside them. Kelsey said they smelled "like skunk." Kelsey acknowledged that these pipes had been in the home for years and while her father also lived in the home. Kelsey said that Crystal's mood would rapidly change, suddenly becoming happy after spending time in the basement. When Kelsey asked about Crystal's drug use, Crystal admitted to

using marijuana and told Kelsey "that marijuana wasn't a real drug so it was okay." Crystal denied using methamphetamine, and Kelsey admitted she never saw Crystal use drugs or drink alcohol.

Will Katherin, a PromiseShip family permanency specialist, testified regarding his experience with Jason's family. Crystal's attorney objected to Katherin's testimony and the introduction of a certified copy of his juvenile court case, which the court overruled. In September 2017, Jason was arrested after driving under the influence of methamphetamine, during which he led Omaha police officers on an automobile chase before flipping his automobile. Both Jason and his son, who was a passenger in the automobile, received emergency medical attention. Katherin testified that he was concerned for Geonni and Kelsey being in a home with Jason because there was no evidence that Jason's drug use had ended. Although Jason had been ordered to complete urinalysis testing, he had not done so. Additionally, Katherin testified that Jason was ordered not to have contact with his children unless supervised.

Heather Newton, a DHHS initial assessment worker, began working with Crystal, Kelsey, and Geonni in January 2018. Her relationship with the family began after concerns arose regarding the condition of their home, alleged drug use by Crystal, domestic violence allegations, and allegations that Kelsey had been caring for Geonni primarily and was kicked out of the home by Crystal. After first meeting with Geonni and Kelsey on February 1, Newton unsuccessfully attempted to complete a home walkthrough on the same day. Jason was outside the home and told Newton that Crystal was not home, and Newton observed that Jason had unfettered access to the home. Newton called Crystal on February 1 and again went to the home on February 2, but Crystal did not respond to either attempted contact. Finally, Newton spoke with Crystal for the first time on February 5 and scheduled a home walkthrough for February 14. However, on February 11, Crystal cancelled the planned home walkthrough. Crystal never allowed Newton to walk through the home to evaluate safety concerns and determine whether the children's needs were being met.

Because Newton had received numerous reports from Geonni's school during the interim regarding his substandard hygiene and attendance, Geonni was taken into protective custody on February 14 after a 20-minute standoff during which Crystal and Jason would not open the door for Newton and uniformed police officers to enter the home. However, from the doorway, Newton did not observe any drug paraphernalia. Newton never formed a safety plan to keep the children in Crystal's home because she was never able to get in contact with Crystal.

On July 30, 2018, the juvenile court entered an adjudication and disposition order. The court found that the State proved by a preponderance of the evidence the allegations that Crystal's drug and alcohol use placed the children at risk for harm, that Crystal lived with a man named Jason who was the subject of an open juvenile court matter that precluded his children from placement in his home, that Crystal had failed to provide proper parental care, support, supervision, and/or protection for the children, and that the children were at risk for harm due to the aforementioned. The court found that the State had not proved that Crystal failed to provide for the daily needs of Geonni and Kelsey. The court held that reunification with Crystal or family preservation with Geonni and Kelsey's father was the permanency objective and that it would be contrary to the children's health and safety to be returned to Crystal's home at present. The court ordered DHHS to retain care and custody of the children and ordered that the children's placement exclude Crystal's home.

The court entered dispositional orders directing Crystal to undergo a chemical dependency evaluation and a psychological evaluation. The court further ordered Crystal to submit to random drug and alcohol testing and to cooperate with DHHS family support services. Crystal was prohibited from having any kind of contact with Geonni and Kelsey until future court order.

On August 27, 2018, the court held a hearing on Crystal's motion for supervised visitation. The guardian ad litem offered testimony from Jennifer Cherney, the family permanency specialist who began working with the family in March 2018. Cherney testified that Crystal previously had been allowed to have supervised visitations with Geonni and Kelsey. However, the State filed a motion to suspend those visits after Crystal showed up to Geonni and Kelsey's therapy without supervision in May. At the hearing, the State introduced a safety plan whereby Crystal would be eligible for visitation again once she participated in DHHS services, completed court-ordered evaluations, and began seeing a therapist. The record indicates that, at that hearing, Crystal orally agreed to that plan but the parties did not include the terms of the safety plan or any order in connection with that hearing in the transcript or bill of exceptions. Cherney acknowledged that Crystal had begun the process to set up the requisite evaluations and that there had been no safety concerns during the period in which Crystal had supervised visitation with Geonni and Kelsey. However, Cherney testified that Crystal had not completed the evaluations or engaged in DHHS services during the 3-month period between the safety plan's creation and the hearing on Crystal's motion. Cherney opined that it was not in Geonni and Kelsey's best interests to have supervised visitation at that time because Crystal did not understand boundaries, appropriateness, or the children's safety. The juvenile court ended the hearing on Crystal's motion by encouraging Crystal to comply with court-ordered rehabilitative measures (set forth in the adjudication order) and the safety plan's directives which are not in our record. The court's order on Crystal's motion for supervised visitation also does not appear in our record.

Crystal now appeals.

## III. ASSIGNMENTS OF ERROR

Crystal assigns, restated, that the juvenile court erred in (1) finding sufficient evidence of Crystal's drug and alcohol use, and other "actions," placing the children at risk for harm, (2) considering evidence of Jason's juvenile court case, (3) entering dispositional orders without providing notice or an opportunity for Crystal to be heard, and (4) denying Crystal's motion for supervised visitation.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independent of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

The Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. *In re Interest of Ashley W.*, 284 Neb. 424, 821 N.W.2d 706 (2012). In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is

controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law. *In re Interest of Kane L. & Carter L., supra*.

## V. ANALYSIS

Section 43-247 sets forth particular circumstances under which a juvenile court may adjudicate a child. In relevant part, juvenile courts have jurisdiction of juveniles who lack proper parental care by reason of the fault or habits of a parent. § 43-247(3)(a). The adjudication phase exists to protect juveniles' interests and does not require a juvenile court to wait to acquire jurisdiction until disaster has actually befallen a juvenile. *In re Interest of Kane L. & Carter L., supra*. To obtain jurisdiction pursuant to § 43-247, a court's only consideration is whether the juvenile presently falls within the asserted subsection. *In re Interest of Kane L. & Carter L., supra*. Moreover, the State need not prove a juvenile has suffered actual harm. *Id*. Instead, the State must show that, absent any intervention, there is a definite risk of future harm to the juvenile. *Id*. The State must prove all allegations by a preponderance of the evidence. *Id*.

### 1. SUFFICIENCY OF EVIDENCE

Crystal argues that the juvenile court relied on insufficient evidence in finding that her drug use put Geonni and Kelsey at risk for harm. The State argues in response that it satisfied its burden by putting forth a preponderance of the evidence that Crystal's drug use placed the children at risk for harm. Based on the following, we find there was sufficient evidence that Crystal's drug use placed the children at risk for harm.

At the adjudication stage, in order for a juvenile court to assume jurisdiction of minor children under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence. *In re Interest of Elijah P. et al.*, 24 Neb. App. 521, 891 N.W.2d 330 (2017).

In the present case, the juvenile court received evidence regarding Crystal's marijuana use. Kelsey testified that there were glass pipes throughout the home that smelled like a skunk. Kelsey described a conversation in which Crystal admitted to using marijuana and said that marijuana was not a real drug. As is consistent with drug use, Crystal's mood would suddenly improve after having spent time in the home's basement while Geonni and Kelsey were present in the home. Additionally, witnesses described Jason's fulltime presence and access to the home and his history of methamphetamine use. Jason had not complied with court-ordered urinalysis testing, raising the suspicion, at the very least, that his drug use may be ongoing.

In addition to using drugs while the children were in the home, there was also evidence presented to establish that Crystal associated with other drug users and invited them into the home while Geonni and Kelsey were present. Kelsey described Jason's continuous presence in their home and the presence of others, at least one of whom was described by Crystal as wanted by the authorities. Crystal left Geonni in Kelsey's care for extended periods of time, relying on Kelsey to get Geonni dressed and ready for school in the mornings, and a DHHS worker testified that Geonni's school became concerned with his hygiene shortly after Kelsey moved out of Crystal's home and was no longer caring for Geonni. These additional decisions or "actions" by Crystal placed her children at a definite risk for harm.

Based on the foregoing, there was sufficient evidence for the juvenile court to determine that Crystal used drugs and made poor decisions that placed Geonni and Kelsey at risk for harm, and that they lacked proper parental care by reason of the faults or habits of Crystal, their mother. Accordingly, the juvenile court relied on sufficient evidence in adjudicating Geonni and Kelsey as minors under § 43-247(3)(a) and, thus, we affirm.

## 2. EVIDENCE OF OPEN JUVENILE COURT CASE

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Rev. Stat. § 27-401 (Reissue 2016).

Crystal argues that the juvenile court improperly considered evidence of Jason's juvenile court case in receiving a certified copy of a juvenile court docket and testimony from Katherin, the family permanency specialist working with Jason's family. While Crystal acknowledges that "[t]he ultimate issue before the court in the present case is whether the mother's relationship with Jason [] placed the children at a definite risk for future harm," she nonetheless argues that details of the juvenile court action involving Jason were irrelevant and prejudicial. Brief for appellant at 15. Crystal's paradoxical argument is unpersuasive. Due to Jason's continuous presence in the children's home, the juvenile court properly received a certified copy of the juvenile court matter involving Jason and relatively brief testimony from Katherin regarding the incident at the heart of Jason's juvenile court involvement.

Katherin described Jason driving while under the influence of methamphetamine and leading authorities on an automobile chase while his son was a passenger. The chase resulted in Jason's automobile flipping and his son and him receiving emergency medical treatment. Details of the way that Jason cares for his own children are uniquely relevant to the present matter because Jason is a fulltime resident of the home in which Geonni and Kelsey lived. Evidence of Jason's behavior toward juveniles is not unduly prejudicial but, instead, relevant in determining whether Crystal's behavior--especially her living with Jason--places Geonni and Kelsey at risk for harm. Accordingly, the juvenile court did not err in admitting evidence of Jason's juvenile court case.

## 3. ORDER DATED JULY 30, 2018

Crystal argues that she was denied due process of law when, according to its July 30, 2018, order, the juvenile court required her to undergo certain evaluations and drug testing and to not have contact with Geonni and Kelsey until further court order. Crystal argues that she was denied

an opportunity to address those matters before the court entered its "disposition order." Based on the following, we find that the juvenile court did not deny Crystal due process of law in its July 30 order.

Because of a natural parent's fundamental liberty interest in the care, custody, and management of their child, if the State intervenes to adjudicate a child or terminate the parent-child relationship, its procedures must meet the requisites of the Due Process Clause. *In re Interest of Landon H.*, 287 Neb. 105, 841 N.W.2d 369 (2013). Procedural due process requires notice to the person whose right is affected by the proceeding, reasonable opportunity to refute or defend against the charge or accusation, reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation, representation by counsel when such representation is required by the Constitution or statutes, and a hearing before an impartial decision maker. *Id*.

A juvenile court has the discretionary power to prescribe a reasonable program for parental rehabilitation to correct the conditions underlying the adjudication that a child is a juvenile within the Nebraska Juvenile Code. *In re Interest of Rylee S.*, 285 Neb. 774, 829 N.W.2d 445 (2013). The provisions of a rehabilitation plan must be reasonably related to the plan's ultimate objective of reuniting parent with child. See *id*. Similar to other areas of law, reasonableness of a rehabilitative plan for a parent depends on the circumstances in a particular case and, therefore, is examined on a case-by-case basis. *Id*.

In the present case, Crystal does not allege that the adjudication hearing contravened her due process rights. Instead, she argues that she was entitled to a separate, additional hearing before the court entered any dispositional orders. Following the adjudication hearing, on July 30, 2018, the juvenile court entered its "Adjudication and Disposition Order and Notice." This order directed Crystal to undergo chemical dependency and psychological evaluations, cooperate with services put in place by DHHS, submit to random drug testing, and have no contact with Geonni and Kelsey until further court order. However, in that same order, the juvenile court set "a continued Disposition and Evaluation hearing on September 24, 2018 at 1:30 p.m., with a predisposition evaluation to be conducted by Nebraska Department of Health and Human Services/PromiseShip." Thus, the juvenile court's use of the term "Disposition" in its July 30 order refers at most to a temporary or interim disposition pending the final disposition hearing set in September. In its order, the court prescribed a reasonable rehabilitation program for Crystal while also providing the court with needed information for the scheduled disposition.

It is also important to note that these portions of the July 30, 2018, order which relate to disposition--that Crystal was to undergo chemical and psychological evaluations, cooperate with family support services, and submit to drug and alcohol testing--related to the court's May hearing governing the State's motion to suspend visitation and Crystal's oral agreement to comply with the terms of the safety plan in order to regain her visitation rights. Although the terms of the safety plan and Crystal's voluntary agreement to comply do not appear in our record, excerpts from the August 27 hearing on Crystal's motion to regain visitation rights suggest that she agreed to terms consistent with the court's dispositional order in order to regain her rights to visitation.

In any event, our record makes it clear that the juvenile court's July 30, 2018, order was not the actual or final disposition as the term is commonly understood, despite the order's use of

that term. The July 30 order dealt with predispositional matters, including ordering that it was in Kelsey's and Geonni's best interests to remain in DHHS' custody. Under Neb. Rev. Stat. § 43-281(1) (Reissue 2016), a court may place a juvenile in the DHHS' care and custody following an adjudication under § 43-247(3)(a) *and prior to final disposition*. Thus, the portion of the July 30 order dealing with disposition was merely an interim order governing the issue of regaining visitation rights and was of temporary duration leading to final disposition.

Moreover, many of these issues were addressed in the May 2018 hearing which resulted in Crystal's voluntary compliance and in an evidentiary hearing on Crystal's motion for supervised visitation that took place on August 27, a day prior to the filing of her notice of appeal. Counsel for Crystal acknowledged in her closing argument that Crystal's visitation rights were initially cut off after a hearing in May and that they continued to be suspended by order of the court based on the evidence adduced at the trial in July. The court noted during the hearing that nothing had changed since the time that visitations were suspended in May. The court then stated: "Now, we're going to reach a point where visits will be reinstituted, but we're going to have to proceed carefully, I think, and we need the direction . . . of the mental health professionals. We need these evaluations to guide us." Based on the record before us, we surmise that the juvenile court's directives on July 30 were predispositional and intended to guide its decision at the future disposition hearing. As such, it appears from the record that Crystal was afforded an opportunity to be heard with regard to issues that are incidental to disposition, including visitation on at least three occasions during the months leading up to the appeal.

Based on this record, we cannot find that Crystal's due process rights were violated. While we acknowledge that the juvenile court used language in its July 30, 2018, order which labeled the order in part to be a "disposition," we do not believe that on this record, it was meant to be a final disposition as that term is used in § 43-281(1). Rather, the July 30 order was merely temporary or transitional in nature. Moreover, given the frequent opportunities given Crystal to address her concerns before the court, we cannot find that she was denied due process.

Therefore, we affirm the juvenile court's entry of the order dated July 30, 2018.

### 4. MOTION FOR SUPERVISED VISITATION

Crystal argues that the juvenile court erred in denying her motion for supervised visitation, and the State argues in response that Crystal failed to take steps toward reinstating visitation as instructed by the safety plan. While our record includes a transcript of the hearing on Crystal's motion for supervised visitation, we were not provided a copy of Crystal's motion or the juvenile court's order denying the same. It is incumbent upon an appellant to supply a record which supports his or her appeal. *State v. Boche*, 294 Neb. 912, 885 N.W.2d 523 (2016). Absent such a record, as a general rule, the decision of the lower court as to those errors is to be affirmed. *Id.* Because Crystal did not supply a record that supports her appeal, we affirm the juvenile court's order denying her motion for supervised visitation.

### VI. CONCLUSION

Based on our de novo review of the evidence contained in the record, we find that the juvenile court relied on sufficient and relevant evidence in adjudicating Geonni and Kelsey

pursuant to § 43-247(3)(a). Crystal's due process rights were not infringed when the court entered its orders following the adjudication hearing. Thus, we affirm the juvenile court's adjudication. Because our record contains insufficient evidence to review Crystal's appeal from the juvenile court's denial of her motion for supervised visitation, we therefore affirm that order as well.

AFFIRMED.