IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DIEGO A. & MARISSA D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DIEGO A. & MARISSA D.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SHEILA A., APPELLANT.

Filed December 28, 2021.    Nos. A-21-332, A-21-333.

Appeals from the County Court for Lincoln County: KENT D. TURNBULL, Judge. Affirmed.

Chevas Shaw for appellant.

Rebecca Harling, Lincoln County Attorney, for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Sheila A. appeals from the orders of the county court for Lincoln County, sitting as a juvenile court, adjudicating her children, Diego A. and Marissa D., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). We affirm.

## BACKGROUND

Sheila is the mother of Diego, born in 2008, and Marissa, born in 2018. Additionally, Sheila appears to have an older child who was not part of these juvenile proceedings. Anieseto A. is Diego's father. Because Anieseto is not part of this appeal, he will not be discussed any further. The identity of Marissa's father had not yet been determined at the time of the adjudication in this case.

- 1 -

Diego and Marissa were put in a voluntarily kinship placement on September 10, 2020. Subsequently, on October 1, the State filed separately docketed juvenile petitions alleging that Diego and Marissa were children within the meaning of § 43-247(3)(a). The State alleged that on or about September 1 through September 30, the children were "in a situation or engaged in an occupation dangerous to life or limb or injurious to [their] health or morals." Also on October 1, the juvenile court entered orders of detention wherein the court found that continuation of the children in the parental home would be contrary to their welfare, and the court ordered that Diego and Marissa be "detained in the temporary custody" of the Nebraska Department of Health and Human Services (DHHS), pending a hearing or until otherwise ordered by the court. The court also ordered Sheila "to submit to wearing a drug patch to be monitored and paid for by [DHHS]."

In its journal entries and orders entered on October 13, 2020, following a hearing that same day, the juvenile court ordered Sheila to submit to random "UA's" or drug patch testing as a condition of visitation, a chemical dependency evaluation, and a psychological evaluation. The court granted Sheila's motion for paternity testing of the purported father of Marissa.

Additionally, the juvenile court's journal entries and orders entered on October 13, 2020, state, "The court has inquired as to whether any party believes an Indian child/children is/are involved in the proceedings and directs County Attorney/[DHHS] to give notice to the appropriate identified tribe pursuant to the Nebraska Indian Child Welfare Act." The journal entries and orders further state that "[t]he tribe that is on record" was unknown at that time. In journal entries entered on October 27, the court noted that at the October 13 hearing it questioned Sheila regarding any Native American heritage and "[Sheila] states she may be a member of an Indian Tribe." The court found, "pending notice from the Tribe, that the Indian Child Welfare Act applies."

The juvenile court's journal entries and orders entered on November 10, 2020, state that Sheila objected to the condition of the home of the current placement for the children. After an evidentiary hearing on November 17, the court found the condition of the home was adequate and overruled Sheila's objection; Sheila moved for a change of placement. Sheila failed to appear at a hearing on December 9, and therefore the court overruled her motion to change placement. After a hearing on December 29, the juvenile court granted Sheila's attorney's motion for a psychological evaluation of Sheila; the court ordered Sheila to submit to a psychological evaluation to aid in determining whether a guardian ad litem needed to be appointed for her.

A journal entry and order entered on January 26, 2021, states that paternity results were received and Marissa's purported father was not her father.

The contested adjudication hearing was held on March 24, 2021. The juvenile court first took up the motion to have a guardian ad litem appointed for Sheila. Counsel offered Sheila's psychological evaluation into evidence, and it was received. Counsel then asked to withdraw his motion for appointment of a guardian ad litem for Sheila, and based on the evaluation received into evidence, the court granted counsel's request to withdraw his motion. The court then took up the contested adjudication. The court later clarified that Sheila's psychological evaluation was received into evidence only for purposes of the request to withdraw the motion for appointment of a guardian ad litem for Sheila, and it was "not in evidence" for purposes of the adjudication.

Dennis O'Brien, an investigator with DHHS Child Protective Services, testified that he has known Sheila since she was approximately 12 years old, and he had ongoing contact with her. He said, "She would call me if she needed something or if she needed advice or if she needed help

filling [out] . . . a form" because "she struggles with reading." When asked if he knew Sheila in his position as an investigator, O'Brien responded, "As an investigator and then also as an ongoing worker, I think." Before the investigation that led to this current case, he had conducted nine prior investigations of Sheila, most related to physical neglect of the children. The most recent prior investigation was in July 2019 and involved domestic violence. At that time, Sheila was living with a man that paternity testing later revealed was not Marissa's father; the man assaulted Sheila and "hit one of the boys."

On September 10, 2020, O'Brien investigated Sheila and the care she was providing to her children. He stated that DHHS received an intake alleging drug use, and Sheila had also withdrawn $24,000 from a credit union. According to O'Brien, Sheila asked the credit union to call the police, and he was "notified of that." O'Brien "was also contacted by the sheriff's office because [Sheila] was at the sheriff's office bailing out a person and told the clerk at the sheriff's office to give me a call and that she wanted to see me." O'Brien went to the hotel that Sheila had been staying at, but she was not there. He eventually made contact with her outside of her place of business.

O'Brien stated that when he made contact with Sheila on September 10, 2020, "She said [she had] been looking for me and . . . she started telling me that she needed to have me take Marissa, put her in foster care because she's not safe with her." Sheila told O'Brien that she was being followed and harassed, and that she had reported being followed multiple times to the police department. She told him that law enforcement could not confirm her reports. According to O'Brien, Sheila was "kind of all over the place," "the subjects would change," and he was concerned. He said, "There were other things that she said, but when I would . . . question her further in those regards, . . . she'd say, no, I can't tell you this or if I tell you this something is going to happen to me," and "so she wouldn't provide me any details that would verify what she was saying." O'Brien had never seen Sheila that paranoid, and was concerned about her mental health and drug use. When O'Brien talked to Sheila about drug use, "[s]he denied any recent drug use, but did admit to prior methamphetamine use, and I think she did admit to smoking marijuana." O'Brien put Marissa in a voluntary kinship placement with "Emma [J.], [who] is a -- kind of a sister-in-law to Sheila"; Diego was placed with Emma as well.

O'Brien testified that after the children were placed with Emma, Sheila made allegations regarding the condition of Emma's home; O'Brien did unannounced visits at the home and "didn't see any problems." He also testified that "there were times where Sheila would come over to [Emma's] house and honk and she would yell things," and law enforcement was called "at least two or three times related to [Sheila's] behavior." On September 17, 2020, O'Brien was contacted by law enforcement who advised that Sheila "was honking and, essentially, harassing Emma," and law enforcement wanted to confirm the safety plan. O'Brien told law enforcement that "[t]he safety plan was that the children . . . were to remain with Emma and that at that point because of Sheila's behavior we were going to have to put in something else to see that visits are supervised or to monitor behavior." O'Brien subsequently talked to Sheila about "doing a non-court case," but "she declined . . . after we sat down and she found out that drug testing was going to be a part of that." Once Sheila declined the non-court case, O'Brien "requested the filing" of a juvenile petition "[b]ecause of her erratic behavior and her not cooperating." The juvenile court asked O'Brien if the concerns about Sheila's behavior continued from the time he first made contact with her until the point he asked for a filing by the county attorney. O'Brien responded, "It got worse."

During O'Brien's investigation in this case, he learned about some of the people with whom Sheila was associating. Sheila told O'Brien that she had been associating with Marcos E., and that caused O'Brien concern for Sheila and the children because he had prior contact with Marcos and knew "he can be violent" and had "his own addiction issues." Another associate of Sheila's was Trini T., who O'Brien knew had a history of methamphetamine use. O'Brien stated that on September 10, 2020, Trini, Sheila, and Marissa were living at the hotel; Diego was living with Sheila's father at the time. Trini was at the jail "on a warrant out of Box Butte County" when Sheila reached out to O'Brien.

During cross-examination, O'Brien was asked if he was aware that Sheila reported that she was shot at on September 13, 2020. O'Brien responded, "She did say that." He also testified that a hair follicle test was conducted on Marissa on September 14, and she was positive for cannabis; no hair follicle test was done on Diego. Additionally, he testified that Marissa's father had never been formally identified.

Officer Toby Smith with the North Platte Police Department testified that on September 29, 2020, he was dispatched to Emma's place of work on a complaint of trespassing. Emma told Officer Smith that Sheila--who had previously been ticketed for trespassing at the business--was at the business again that day, confronted Emma, and created a disturbance, including yelling and screaming; Sheila was asked to leave several times before she eventually left the business. Officer Smith made contact with Sheila that same day, and said that she was "erratic, angry that she was getting a citation," and she was "paranoid." When asked what he meant when he said "'paranoid,'" Officer Smith responded, "[I]n the contacts that I have had with Sheila . . . she's always concerned about people following her . . . or that maybe police are being unjust, that . . . our contacts with her are unwarranted, things like that." Officer Smith has had more than 10 contacts with Sheila, starting in "the later half of 2020," and her demeanor has been the same. Sheila caused a disturbance at the police department and is now only supposed to be there if she has a "valid claim" or has need of law enforcement's assistance. When asked if Sheila had made any allegations against him personally as an officer, Officer Smith responded that Sheila "[m]ade an allegation of inappropriate conduct, criminal mischief at one point, allegations that I stalk her"; Officer Smith denied the allegations. The police department's contacts with Sheila have declined in frequency; when asked for a time frame for the decline, Officer Smith responded, "Within the new year maybe."

Officer Smith stated that he arrested Trini for distribution of methamphetamine on September 29, 2020. Officer Smith "believe[d]" he saw Trini operating Sheila's car "[a]bout a week" prior to the adjudication hearing.

Hope Holmes, a DHHS child and family services specialist, testified that she has been the ongoing caseworker since October 2020. According to Holmes, Marissa's hair follicle test was positive for THC; according to O'Brien, this test was conducted on September 14. Diego was not tested "primarily due to his age." Holmes was asked if the concern was that if a 13-year-old comes back with a positive THC test it could be that the 13-year-old was using THC, Holmes responded, "Possibly." According to Holmes, Sheila denied both methamphetamine and THC use, and Sheila would not wear a drug patch until December.

Holmes was asked to describe Sheila's behavior towards her. Holmes replied,

> A lot of the time she's very upset, accusing me of not caring about her kids at times, threatening to sue everyone involved in this case, saying that she's having contact with federal courts in Omaha.
>
> She's -- we've probably had the same conversation about why her children have been in care numerous times. She hasn't really been tracking some of our conversations about, like, Marissa's hair follicle. I think I had that conversation with her about three times about her testing positive, and so she's not really following what I am say -- telling her all the time.
>
> So it ends up being a lot or repeated conversations. Sometimes they'll -- she escalates to yelling and swearing and -- but there have been other times where I have had productive conversations with her as well.

The juvenile court asked Holmes if she had done any investigation as to whether or not the Indian Child Welfare Act (ICWA) applied to this matter. Holmes responded that Sheila "indicated that she believes she has Native American affiliations, so the department will have to do further inquiry about that" because "[i]t was very vague, what [Sheila] reported for ICWA." Holmes did not have information about the tribe.

Trista Borg, a nurse practitioner, testified that she had seen Sheila and her children as patients for "[a]bout a year and a half." During their interactions, Borg did not suspect that Sheila was using illicit substances and she did not witness any acute mental health episodes. Borg did not have reason to believe that Sheila's children were being neglected or abused. Sheila did ask Borg's colleague to drug test her, and Borg knew the results "were negative"; Borg did not indicate when Sheila completed the drug test.

Christopher K. testified that he had some contact with Sheila because his foster child was friends with Diego. Christopher said Sheila "was always nice." Neither Christopher's foster child nor Diego reported any concerns about Sheila or her home to Christopher. And Christopher never had cause to be concerned that Diego was being abused or neglected.

Natasha Reilly testified that she had been friends with Sheila for "[t]hree years, maybe more," but they had a falling out and went their separate ways after Sheila opened her business. Reilly said that Sheila was a "good mom" who knew how to take care of her children. Reilly had not witnessed Sheila use any illegal substances and was not concerned about her mental health.

In its oral pronouncement and its journal entries and orders filed on March 24, 2021, the juvenile court found by "clear and convincing evidence that the State [had] met its burden," and the court adjudicated Diego and Marissa in accordance with § 43-247(3)(a).

Sheila appeals.

## ASSIGNMENT OF ERROR

Sheila assigns there was insufficient evidence adduced for the juvenile court to find that Diego and Marissa were children within the confines of the juvenile code.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

ANALYSIS

APPLICABILITY OF ICWA

Initially we note that there is some question as to whether ICWA applies to Marissa's case. In her brief, Sheila states that "[i]t is uncontested that [ICWA] does not apply to [Diego's] case." Brief for appellant at 5.

Generally stated, the substantive portions of the federal ICWA, 25 U.S.C. 1901 et seq., and the corresponding provisions of the Nebraska Indian Child Welfare Act (NICWA), Neb. Rev. Stat. §§ 43-1501 to 43-1517 (Reissue 2016), provide heightened protection to the rights of Indian parents, tribes, and children in proceedings involving custody, termination, and adoption. See *In re Adoption of Kenten H.*, 272 Neb. 846, 725 N.W.2d 548 (2007).

> Applicability of these protective statutes depends on whether the proceedings involve an "Indian child." . . . . Pursuant to [§ 43-1503(8)] and 25 U.S.C. § 1903(4), "Indian child means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Under Nebraska law, a party to a proceeding who seeks to invoke a provision of NICWA has the burden to show that the act applies in the proceeding.

*In re Adoption of Kenten H.*, 272 Neb. at 853, 725 N.W.2d at 554. The provisions of ICWA and NICWA apply prospectively from the date Indian child status is established on the record. See *id.*

The record reflects that in October 2020, Sheila told the juvenile court that she may be a member of an Indian tribe. The name of the tribe was never reported to the court. At the adjudication hearing in March 2021, Holmes stated that "[i]t was very vague, what [Sheila] reported for ICWA." And at the time of the adjudication hearing, the identity of Marissa's father had not been established. Accordingly, Marissa's Indian child status had not been established at the time of the adjudication proceeding.

In her brief, Sheila claims that she "had stated that an enrolled member of the Rosebud Sioux Tribe could potentially be Marissa's father." Brief for appellant at 5. She further claims, "Paternity of Marissa was established after the adjudication, confirming that her father was an enrolled member of the Rosebud Sioux Tribe." *Id.* However, any such identification of Marissa's father, or his membership in the Rosebud Sioux Tribe does not appear in the record before us. And by Sheila's own admission, Marissa's paternity was established *after* the adjudication. Accordingly, Sheila did not meet her burden to show that ICWA applied to the adjudication proceeding.

Pursuant to § 43-247(3)(a), and as relevant here, the juvenile court in each county shall have jurisdiction of any juvenile who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; or who is in a situation dangerous to life or limb or injurious to the health or morals of such juvenile.

In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L., supra*. The purpose of the adjudication phase is to protect the interests of the child. *Id.* The Nebraska Juvenile Code does not require the juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. See *In re Interest of Kane L. & Carter L., supra.* While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id.* See, also, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 743, 936 N.W.2d 733, 742 (2020) ("'preponderance of the evidence' . . . is the equivalent of the greater weight of the evidence"; "greater weight of the evidence means evidence sufficient to make a claim more likely true than not true").

Although the juvenile court used a heightened "clear and convincing" standard in this case, only a "preponderance of the evidence" standard was required. See, *In re Interest of Kane L. & Carter L., supra*; *In re Interest of Jeremy U. et al., supra*. We will use the "preponderance of the evidence" standard in our de novo review.

In the juvenile petitions, the State alleged Diego and Marissa were children within the meaning of § 43-247(3)(a) because, on or about September 1 through September 30, 2020, the children were "in a situation or engaged in an occupation dangerous to life or limb or injurious to [their] health or morals."

The evidence at the adjudication hearing was that on September 10, 2020, Sheila was looking for O'Brien, and when she made contact with him, she told him that he needed to take Marissa and put her in foster care because Marissa was not safe with her. Sheila told O'Brien that she was being followed and harassed, something she said she had also reported multiple times to law enforcement. When O'Brien questioned her further, Sheila would not provide any details, saying "'if I tell you this something is going to happen to me.'" Sheila subsequently reported that she was shot at on September 13. A hair follicle test was conducted on Marissa on September 14, and the results showed that she was positive for THC. Sheila denied any recent drug use, but would not submit to drug testing.

After the children were put in a voluntarily kinship placement with Emma on September 10, 2020, Sheila harassed Emma resulting in multiple calls to law enforcement. Both O'Brien and Officer Smith testified about Sheila's "erratic" and "paranoid" behavior prior to the filing of the juvenile petitions.

In her brief, Sheila contends that "[i]n the present case the only harm alleged was by the mother herself, for which she sought appropriate remediation." Brief for appellant at 9. "Never did it cross her mind that once she reached out to Mr. O'Brien that both her children would be removed from her care." *Id*. at 7. The fact that it was Sheila herself that alleged the harm does not affect the

outcome of this case, nor does the fact that she never thought that both of her children would be removed from her when she reached out to O'Brien. As stated previously, the purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). And the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L., supra*. Additionally, Sheila claims that her psychological evaluation does not suggest that she is a danger to herself or others. However, the psychological evaluation was not offered or received into evidence for purposes of the adjudication hearing and therefore cannot be considered here.

Based on our de novo review of the record as set forth above, including Sheila's own statements to O'Brien that her child was not safe with her, we find by a preponderance of the evidence that Diego and Marissa were at a definite risk of future harm. We also find by a preponderance of the evidence that Diego and Marissa were children within the meaning of § 43-247(3)(a). We therefore affirm the adjudications of Diego and Marissa.

## CONCLUSION

For the reasons stated above, we affirm the orders of the juvenile court adjudicating Diego and Marissa.

AFFIRMED.