IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF CHLOE R. ET AL.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF CHLOE R. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JONATHAN R., APPELLANT.


Filed March 10, 2020.    No. A-19-607.


Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Kevin Ryan, of Ryan Law Offices, for appellant.

Laura Lemoine, Deputy Douglas County Attorney, and Katherine Corwin, Senior Certified Law Clerk, for appellee State of Nebraska.

Anne E. Troia, P.C., L.L.O., guardian ad litem.


MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Jonathan R. appeals from the order of the separate juvenile court of Douglas County terminating his parental rights with respect to Kaitlyn R., Alannah R., and Chloe R. For the reasons that follow, we affirm the juvenile court's order.

BACKGROUND

In the juvenile court proceedings below, this matter involved seven children, but this appeal only concerns Jonathan and the three children he fathered: Kaitlyn, born in 2008, Alannah, born in 2013, and Chloe, born in 2017. For a period of time following Chloe's birth, her paternity was unknown although Jonathan held himself out as her father. Jonathan's paternity of Chloe was later established by DNA testing in November 2018.

The children were adjudicated as juveniles within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) on October 31, 2017, with respect to Jonathan. Jonathan entered a plea admitting to the allegations that he had failed to provide proper parental care, support, supervision, and/or protection of Kaitlyn, Alannah, and Chloe and that his failure had put the children at risk for harm. Jonathan was ordered to complete a co-occurring evaluation, cooperate with the services of a family support worker, abstain from the use or possession of illegal drugs or alcohol, and submit to random drug and alcohol testing. At the same time, the court suspended Jonathan's visitations with Kaitlyn and Alannah but left in place his visitations with Chloe. On December 18, 2017, following a disposition and permanency planning hearing, the juvenile court reiterated its past orders with respect to Jonathan and additionally ordered him to attend individual therapy, maintain safe and suitable housing, maintain a legal source of income, and participate in supervised visitation.

The operative motion for the termination of Jonathan's parental rights, the third such motion, was filed on January 30, 2019. The State alleged that termination was warranted under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that termination was in the best interests of the children. With respect to § 43-292(6), the State specifically alleged that reasonable efforts to preserve and reunify the family had failed insofar as Jonathan did not put himself in a position to parent the children through his failures to participate in visitation, obtain safe and stable housing, maintain a legal source of income, consistently participate in drug testing, and communicate with the caseworker. This matter came on for trial on May 1, 3, 9, and 23, 2019.

Kaitlyn and Alannah were removed in August 2017 and began living in the foster care of their maternal grandparents, where they remained at the time of trial. Their grandfather, Ervin Portis, testified that Kaitlyn and Alannah spent "a lot of time" with his wife and him ever since they were born, estimating that they visited three to four times per week. Portis said that Kaitlyn was angry and argumentative for about the first year after she and Alannah moved into his home. According to Portis, Kaitlyn spoke about Jonathan with anger and would say things like, "My father abandoned me. I hate my father. I hate what he did to us with [his girlfriend]." Portis said that Kaitlyn told him about times when Jonathan and his girlfriend would disappear for up to 5 days at a time, leaving her with his girlfriend's sons and putting her in charge of baby Chloe. Kaitlyn said that she did not feel safe in Jonathan's home and did not want to return to his care.

Portis testified that Alannah similarly expressed anger toward Jonathan and felt abandoned by him. Alannah, who was only 4 years old when she moved into Portis' home in August 2017, once acted out and said to Portis, "I'm going to cut you." When she calmed down later, Alannah said she learned that phrase from Jonathan's girlfriend. Portis testified that when he picked up Alannah in August 2017, she was unclean and clearly had not been bathed for days. He also said that Alannah told him she had not eaten anything except for candy for days before he arrived.

During the course of their living with him, Portis said Kaitlyn's and Alannah's behaviors improved. He said that at the time of trial, Kaitlyn was able to focus at school, did not have angry outbursts, and was more even-keeled. He said that Kaitlyn had told him that she felt safe and secure in his home. Alannah also progressed and was "bubbly," doing well in preschool, and engaged with a group of friends at the time of trial according to Portis. Portis attributed the girls' behavioral improvement to the structure and accountability that he and his wife had introduced into their lives.

When the court ordered that Jonathan participate in family therapy with Kaitlyn and Alannah with a neutral third-party therapist in December 2018, Portis testified that Sabrina Knerr, the family's case manager, told him to ask Kaitlyn and Alannah whether they wanted to attend. He said that Knerr told him to take Kaitlyn and Alannah if they wanted to have a visit with their father and to cancel the family therapy if the girls did not want to see Jonathan. Portis testified that Knerr specifically told him that it was the girls' choice whether to have visitation with their father. Portis said that he asked Kaitlyn and Alannah about three or four visitations and that they always told him they did not want to attend.

Chloe was placed in the foster care of Kandi Hendershot in August 2017 when she was 5½ months old. Hendershot testified that Jonathan had no visits with Chloe between the fall of 2017 and November 2018. She said that Jonathan held himself out as Chloe's father from the case's beginning, but she acknowledged that some delay in visitations was caused by his paternity not being established immediately. Regular supervised visitations with Chloe did occur beginning in November 2018. Hendershot testified that she had no concerns regarding Jonathan's visitations with Chloe.

Renee Steinhoff supervised Jonathan's visitations with Chloe from August through November 2017. Steinhoff testified that Jonathan's attendance was inconsistent. "There were times we couldn't get ahold of him." Some visitations were cancelled even after he was placed on a call-to-confirm basis because he failed to call at the beginning of the week to confirm his attendance. Nevertheless, there were no concerns with the visitations that Jonathan did attend. He was discharged on November 29, 2017, after the caseworker put his visitations on hold.

Toward the end of August 2017, a visitation was scheduled at Jonathan's home between the children and him. The family permanency specialist took the children to his home, but after waiting for about 35 minutes without Jonathan showing up, they left. The family permanency specialist testified that the children were crying and "highly upset." When she was driving the children back to their grandparents' home, she had to pull over on the side of the road and have Alannah call her grandmother in order to calm down because she was crying and blaming herself for Jonathan's absence.

Visitations with Kaitlyn and Alannah were suspended on October 30, 2017, according to Knerr. Even though Jonathan could continue having visitations with Chloe thereafter, Knerr testified that she did not believe he had any for a while.

Andrea Joyce, a licensed independent mental health practitioner, counseled Kaitlyn from the fall of 2017 through the time of trial. Joyce initially saw Kaitlyn for one or two sessions each week. However, as Kaitlyn progressed, her counseling sessions were reduced to weekly, then twice monthly, and then monthly. Joyce said that Kaitlyn again saw her once or twice per week when her symptoms temporarily worsened. Joyce diagnosed Kaitlyn with attention-deficit/hyperactive

disorder based, in part, on reports of her throwing tantrums, becoming physically aggressive toward her grandparents, and refusing to go to school or complete homework. Additionally, Kaitlyn was diagnosed with oppositional defiant disorder based on the results of a psychological evaluation.

During the course of counseling with Joyce, Kaitlyn described experiences with Jonathan and how they made her feel. Joyce said that Kaitlyn described Jonathan leaving Alannah, Chloe, and her with his girlfriend's sons for days at a time. Kaitlyn told Joyce about one occasion when Jonathan left them alone for five days. She described other times when Jonathan would drop them off with strangers without them knowing how long he would be gone. Kaitlyn told Joyce that she would wake up in the night to feed and change Chloe because Jonathan and his girlfriend did not do it. She also told Joyce about parties that Jonathan had, during which Kaitlyn observed people drinking alcohol and smoking from pipes. Kaitlyn also told Joyce about her mother and Jonathan's girlfriend physically fighting in front of her.

Joyce said that Kaitlyn made progress during counseling after taking approximately nine months to open up to her. At the time of trial, Kaitlyn was speaking freely about past trauma and was able to write letters to Jonathan about her traumatic experiences. Joyce attributed Kaitlyn's progress to counseling and the stability, consistency, and follow through provided by her grandparents' foster care. Joyce testified that she worried Kaitlyn would be re-traumatized and regress if she is taken out of foster care and placed back with Jonathan.

Alannah began seeing Joyce for counseling in January or February 2018. Joyce diagnosed her with adjustment disorder based on her throwing "severe tantrums," which included screaming for hours, refusing to comply with reasonable requests, and verbally and physically lashing out at caregivers. Like Kaitlyn, Alannah told Joyce about Jonathan leaving them for 5 days while he stayed at a hotel with his girlfriend and, on other occasions, leaving them with people who they did not know without knowing when he would return. Joyce testified that Alannah told her that Jonathan's girlfriend's son had sexually assaulted her on multiple occasions. Alannah said Jonathan's response was to tell her that the son would not do it again. By the time of trial, Joyce said that Alannah had made progress and was no longer having inappropriate tantrums. Joyce attributed the progress to the counseling, through which they built rapport and trust with each other, and the foster grandparents' consistency, stability, and support.

Joyce testified that she asked both Kaitlyn and Alannah about attending therapy with Jonathan and that both girls did not want to take part. Joyce said that she brought up the subject at least five times and encouraged them to participate in family therapy if for no reason other than telling Jonathan that they did not want to reunify with him. She said that she also tried helping Kaitlyn and Alannah identify the positive aspects of participating in family therapy. She also said that she discussed Jonathan's progress, negative drug tests, and employment and that Kaitlyn and Alannah reacted positively to that information. When she told the children that Jonathan was no longer with his girlfriend, they reacted positively, but Kaitlyn told Joyce that she did not believe the two were actually separated. Nevertheless, Kaitlyn and Alannah were unwilling to attend counseling with Jonathan, and Joyce testified that forcing them into family therapy would re-traumatize them because they were not ready to discuss their past trauma with Jonathan.

Knerr began as the family's case manager on May 24, 2018. She attempted monthly contact with Jonathan by telephone, but her calls went unanswered in June and July 2018. She testified that she was aware that Jonathan had been court ordered to complete a co-occurring evaluation on October 30, 2017, which was not completed until October 30, 2018. Knerr testified that she knew Jonathan had been ordered to complete individual therapy on July 30, 2018, and the co-occurring evaluation recommended that he also attend group therapy and outpatient therapy. In December 2018, Jonathan wrote letters to Kaitlyn and Alannah, which were turned in to Knerr. Knerr testified that she did not give them to the children because they were inappropriate and mentioned that they would be going home to live with Jonathan soon, which she said was "known to cause them anxiety."

Knerr testified that Jonathan was unsuccessfully discharged from a drug testing provider on December 19, 2017, due to lack of engagement. He was again discharged unsuccessfully from the same provider due to lack of engagement on September 17, 2018. Knerr testified that Jonathan did not complete all drug testing and that a missed drug test was considered a presumptive positive. He missed two drug tests in each of December 2018 and January and February 2019. In January or February 2019, Jonathan rescinded the release he had provided that allowed Knerr to speak with his therapist. Knerr could not monitor Jonathan's progress or attendance at therapy once he withdrew the release. He then missed three drug tests in March 2019. He was referred to Capstone on April 19, 2019, and discharged unsuccessfully on May 15, 2019, due to lack of engagement.

On July 30, 2018, Jonathan was ordered to obtain a source of income. Knerr testified that she did not assist Jonathan in obtaining employment because he said he already had a job and provided her with a paystub. She said that Jonathan recently switched employers and provided her with another paystub on April 24, 2019.

Knerr opined that termination of Jonathan's parental rights was in the children's best interests. She based her opinion on the children having been continuously outside the home for 16 months by the time the motion to terminate was filed. She also based her opinion on Kaitlyn and Alannah no longer wishing to have contact with Jonathan, him only participating in 4 out of 21 visitations with them before visitations were suspended, and only exercising 3 visitations with Chloe between September 2017 and July 2018. She also believed that Jonathan was not internalizing any change or taking the matter seriously based on a conversation with him after a December 2018 team meeting.

Jonathan was arrested on September 5, 2018, on an outstanding warrant after being charged as an accessory to Class II or IIA felony (robbery), which occurred on June 26. He was released on bond on October 20, 2018. He entered a guilty plea to that charge on March 28, 2019. From our record, there is no indication that Jonathan had been sentenced as of the time of the termination trial.

Daniel Alaniz, who began as Jonathan's family support worker on October 26, 2018, testified that Jonathan "basically obtained all of" the goals that were set for him before he was discharged on March 12, 2019. Alaniz said that the goals for Jonathan were obtaining a stable income, obtaining housing, completing a chemical dependency evaluation and following its recommendations, and obtaining a driver's license. Jonathan moved into an apartment, which Alaniz visited on February 13, 2019. Jonathan reported that he was employed but did not provide

paystubs or other proof of employment to Alaniz. He also self-reported that he was attending Alcoholics Anonymous (AA) or Narcotics Anonymous (NA) meetings but did not otherwise provide proof of his attendance.

After meeting twice monthly in November and December 2018 and January 2019, Jonathan did not reply to Alaniz's attempted contacts via telephone calls and text messages between February 12 and March 12, 2019. Alaniz ultimately successfully discharged Jonathan on March 12, 2019, because he had completed the goals set for him. Alaniz admitted that the only evidence of Jonathan's completion of tasks was his own reports.

Jonathan saw a provisionally licensed mental health practitioner, Joseph Van Trimmell, who completed a co-occurring evaluation of him on October 30, 2018. Van Trimmell diagnosed him with severe methamphetamine use in early remission, and he recommended that Jonathan complete Level 1 outpatient therapy. Level 1 outpatient therapy includes weekly individual therapy sessions and twice weekly group therapy sessions. Van Trimmell testified that he was concerned that Jonathan did not fully understand his substance abuse when he first began therapy because he seemed less concerned about his use and more concerned about his perceived conflict with the caseworker. He was also concerned that Jonathan lacked follow through.

Van Trimmell testified that he agreed Jonathan could attend a weekend NA/AA meeting instead of one of the two group therapy sessions after he obtained a job that made it difficult for him to attend group therapy during the week. However, Van Trimmell further testified that he did not know how many AA or NA meetings Jonathan attended because he never provided documentation of his attendance. Jonathan attended 12 of the 24 group therapy sessions that he was ordered to attend.

Van Trimmell suggested to Jonathan that he remain in communication with his daughters by writing letters. Although Jonathan had trouble knowing what to say, Van Trimmell testified that he never helped write the letters. Van Trimmell knew of Jonathan writing only one letter, which caused concerns because he said inappropriate things about his daughters moving back home with him.

Jonathan's last meeting with Van Trimmell was on February 21, 2019. Jonathan was scheduled for counseling the following week but did not show up. He also failed to reply to numerous phone calls and voicemails from Van Trimmell. Accordingly, Van Trimmell discharged Jonathan at that time, calling it a partially successful discharge because he had met some, but not all, treatment goals.

On June 19, 2019, the juvenile court entered its order terminating the parental rights of Jonathan. It found that the children were removed on August 17, 2017, and continuously remained in an out-of-home placement through the time of trial. It further found that, although Jonathan made progress with respect to a number of court-ordered services, he nevertheless failed to put himself in a position in a timely manner to reunify with his children. The court found that Kaitlyn, Alannah, and Chloe were children within the meaning of § 43-292(2), (6), and (7) and that termination of Jonathan's parental rights was in their best interests. With respect to § 43-292(6), the court specifically found that Jonathan had failed to consistently participate in drug testing, to communicate with the ongoing caseworker, and to put himself in a position to parent the children. However, the court found that the State had not proved that Jonathan failed to consistently

participate in visitation, to have safe and stable housing throughout the case's duration, and to have a legal source of income through the case's duration. With respect to § 43-292(2), the court found that Jonathan had substantially and continuously or repeatedly neglected and refused to give his children necessary parental care and protection. As to § 43-292(7), the court found that the children had been in out of home placement for 15 or more months of the most recent 22 months. The court therefore terminated Jonathan's parental rights to Kaitlyn, Alannah, and Chloe and ordered that they remain in the custody of the Nebraska Department of Health and Human Services for adoptive planning and placement.

Jonathan appeals the termination of his parental rights.

## ASSIGNMENTS OF ERROR

Jonathan assigns that the juvenile court erred in finding that termination of his parental rights was warranted under § 43-292(2), (6), and (7) and that termination was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven. *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002).

## ANALYSIS

*Statutory Ground for Termination.*

In order to terminate parental rights under § 43-292, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in the section have been satisfied and that termination is in the child's best interests. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Only one statutory ground for termination needs to be proved in order for parental rights to be terminated. *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

Jonathan's parental rights were terminated pursuant to § 43-292(2), (6), and (7). We will primarily analyze this matter under § 43-292(6), which provides for termination of parental rights where, following a determination that the juvenile is one as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family have failed to correct the conditions leading to the adjudication. However, much of the evidence supporting the juvenile court's finding under § 43-292(6) also applies to subsections (2) and (7). We particularly note that as to Jonathan's parental rights to Chloe, Jonathan argues that § 43-292(7) cannot be utilized as a basis for termination as DNA testing did not establish his paternity until approximately 6 months prior to the entry of the termination order. This argument rings hollow in many respects, however, given

that Jonathan at all times in this proceeding held himself out to be Chloe's father, Chloe was removed from Jonathan's care, Jonathan entered his admission to the original petition with respect to Chloe and her older sisters, and Jonathan was offered services relating to all three of his daughters during the entire pendency of the case. We need not decide this issue, however, because Jonathan's rights were properly terminated pursuant to other provisions of § 43-292. We note that in his brief, Jonathan attempts to tie the late confirmation of paternity to his arguments as to Chloe with respect § 43-292(2) and (6) as well. We address that argument below.

In order to terminate parental rights under § 43-292(6), the State must prove by clear and convincing evidence that (1) the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018). The State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. *Id.*

The juvenile court adjudicated Kaitlyn, Alannah, and Chloe as children within the meaning of § 43-247(3)(a) on October 31, 2017, and ordered Jonathan to complete a co-occurring evaluation, cooperate with the services of a family support worker, abstain from the use or possession of illegal drugs or alcohol, and submit to random drug and alcohol testing. Later, the court also ordered Jonathan to attend individual therapy, maintain safe and suitable housing, maintain a legal source of income, and participate in supervised visitation.

It took Jonathan a year to complete his co-occurring evaluation, and he did not diligently follow its recommendations. Based on the co-occurring evaluation, Van Trimmell diagnosed Jonathan with severe methamphetamine use in early remission and recommended that he complete weekly individual therapy sessions and group therapy sessions twice weekly. Jonathan only attended 12 of the 24 group therapy sessions that he was ordered to attend, and Van Trimmell discharged him in February 2019 after he failed to attend a scheduled counseling appointment and then ignored numerous calls and voicemails.

The evidence shows numerous other occasions on which Jonathan was unsuccessfully discharged by service providers due to his lack of engagement, including as recently as May 15, 2019. Jonathan's lack of engagement also caused his March 2019 discharge by Alaniz, a family support worker, after Jonathan ignored calls and text messages from Alaniz between February 12 and March 12, 2019. Additionally, Jonathan did not consistently cooperate with family support workers. Knerr testified that in January or February 2019, he rescinded the release he had provided that allowed her to speak with his therapist. Once he withdrew the release, Knerr could no longer monitor his progress or attendance at therapy.

Jonathan's lack of engagement included missing numerous scheduled drug tests. He missed two drug tests in each of December 2018 and January and February 2019, and he missed three drug tests in March 2019. We further note, as stated above, that the lack of scientific confirmation that Jonathan is indeed Chloe's father did not meaningfully impair Jonathan's ability to participate in the rehabilitative efforts offered to him. There is no indication in the record that services were withheld or Jonathan's ability to interact with Chloe were diminished by the delay in DNA testing.

- 8 -

The evidence shows a pattern of Jonathan's disengagement and repeated failure to comply with rehabilitative services pursuant to the juvenile court's orders. While we do note that Jonathan accomplished some court-ordered objectives, such as obtaining a source of income and suitable housing, he made minimal progress toward rehabilitating himself under § 43-292(6). Accordingly, we affirm the juvenile court's finding that a statutory ground for the termination of Jonathan's parental rights existed. Because we find that a statutory basis for termination pursuant to § 43-292 has been established, we need not further analyze the additional statutory bases that were found by the juvenile court. See *In re Interest of Kendra M. et al.*, 283 Neb. 1014, 814 N.W.2d 747 (2012).

*Best Interests of Children.*

When there exists a statutory ground for the termination of parental rights, the State must then show that termination is in the children's best interests. A parent's right to raise his or her children is constitutionally protected, so the State must also show that the parent is unfit before a court may terminate parental rights. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Austin G.*, 24 Neb. App. 773, 898 N.W.2d 385 (2017). Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Kendra M. et al.*, *supra*. In discussing the constitutionally protected relationship between a parent and a child, our courts have held, """"Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being."'" *Id.* at 1033-34, 814 N.W.2d at 761. The best interests analysis and the parental fitness analysis are fact-intensive inquiries, and while both are separate inquiries, each examines essentially the same underlying facts as the other. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the child's best interests require termination of parental rights. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008).

Trial testimony showed that Kaitlyn and Alannah had suffered trauma under Jonathan's parenting prior to their removal in August 2017. In particular, Alannah reported having been sexually assaulted by a member of Jonathan's girlfriend's family while she was living with Jonathan. When the children were removed from Jonathan's home, Alannah had not been bathed for days and said that she had not eaten anything other than candy for days. She expressed anger toward Jonathan and said she felt abandoned by him. Kaitlyn similarly expressed anger at Jonathan, and she told her therapist that Jonathan would disappear for up to 5 days at a time and leave her to take care of Chloe, an infant.

Through counseling and the structure of their foster home, Kaitlyn's and Alannah's behaviors have improved, and they have begun doing better in school. However, they have both expressed an unwillingness to attend visitation with Jonathan despite encouragement from their

grandfather and counselor. Their counselor, Joyce, testified that forcing them into family therapy or visitations with Jonathan before they were ready would re-traumatize them. Jonathan apparently fails to recognize the trauma he inflicted upon Kaitlyn and Alannah as he wrote them letters in December 2018 discussing them returning to live with him soon. Knerr testified that she did not deliver those letters because their content was known to cause Kaitlyn and Alannah anxiety. Jonathan's failure to recognize and correct his parental shortcomings was further shown in a December 2018 conversation with Knerr, which she characterized as him not internalizing any change or taking the matter seriously. Similarly, Van Trimmell testified that he did not believe Jonathan understand the magnitude of his substance abuse.

Jonathan was also disengaged from visitation and did not fully exercise his rights to visitations with Kaitlyn and Alannah. Knerr testified that he participated in only 4 out of 21 possible visitations with them before visitations were suspended, and he only had three visitations with Chloe between September 2017 and July 2018. His visitation absences were so numerous that visitation supervisors placed him on a call-to-confirm basis. Jonathan only reestablished regular visitation with Chloe, but that did not occur until November 2018, shortly before the third motion for termination of parental rights was filed.

Finally, as we discussed in the previous section, the children were adjudicated on October 31, 2017, and Jonathan failed to rehabilitate himself during the next 18 months before trial occurred in May 2019. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Based on the foregoing, we affirm the juvenile court's conclusion that it is in the children's best interests that Jonathan's parental rights be terminated.

CONCLUSION

In this matter, the State proved the existence of a statutory ground for the termination of Jonathan's parental rights and proved that termination of his parental rights was in the best interests of the children. Accordingly, we affirm the juvenile court's order terminating Jonathan's parental rights with respect to Kaitlyn, Alannah, and Chloe.

AFFIRMED.