IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF PRESTON R. & MALIYAH R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF PRESTON R. AND MALIYAH R.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JOSHUA R., APPELLANT.

Filed December 27, 2022.    No. A-22-405.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Ashley L. Strader, of Ashley Strader Law, P.C., L.L.O., for appellant.

Rachel Lowe, Deputy Douglas County Attorney, for appellee.

MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Joshua R. appeals from the decision of the separate juvenile court of Douglas County adjudicating his children, Preston R. and Maliyah R., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). We affirm.

## II. BACKGROUND

Joshua is the biological father of Preston, born in 2012, and Maliyah, born in 2013. According to the affidavit for removal in this case, Joshua had been awarded full custody of the children by an Iowa district court after the children were removed from their mother, Angel P. The children's mother is not part of this appeal, and she will not be discussed further.

- 1 -

On the evening of February 10, 2022, law enforcement responded to Joshua's home in Omaha, Nebraska, for a domestic disturbance. It was determined that Joshua had been assaulted by his live-in girlfriend, Marlenna H. She was arrested and taken into custody. Preston and Maliyah were not removed from the home that evening. However, following a subsequent investigation by the Nebraska Department of Health and Human Services (DHHS), DHHS was concerned about Joshua's alcohol and drug use, and the past and present domestic violence in his home.

On February 16, 2022, the State filed a petition in the juvenile court alleging that Preston and Maliyah were children within the meaning of § 43-247(3)(a) because they lacked proper parental care by reason of the faults or habits of Joshua. In its petition, the State alleged that: on or about February 10, 2022, law enforcement responded to the family home for a domestic disturbance; Joshua engaged in domestic violence in the family home, placing the children at risk for harm; Joshua failed to take reasonable steps to protect the children from domestic violence; Joshua failed to cooperate with DHHS' investigation into the safety and well-being of the children; Joshua's use and/or possession of alcohol and/or controlled substances placed the children at risk for harm; Joshua failed to provide proper parental care, support, supervision, and/or safety to the children; Joshua failed to provide safe, stable, and/or appropriate housing to the children; and due to the above allegations, the children were at risk for harm. Also on February 16, the State filed an ex parte motion for immediate custody and pickup of Preston and Maliyah, which was granted by the juvenile court that same day. The court granted DHHS temporary custody of the children for placement in foster care or other appropriate placement, but the placement was to exclude Joshua's home.

A contested adjudication hearing was held on April 27 and 28, 2022. In its order filed on May 5, the juvenile court found that the allegations of the petition were true and that Preston and Maliyah were "within the meaning of [§ 43-247(3)(a)] by a preponderance of the evidence insofar as the father is concerned"; the court adjudicated the children accordingly. A disposition hearing was set for May 17.

Joshua appeals.

## III. ASSIGNMENT OF ERROR

Joshua assigns, consolidated and restated, that the juvenile court erred in finding that there was sufficient evidence to adjudicate his children pursuant to § 43-247(3)(a).

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. LEGAL PRINCIPLES

Pursuant to § 43-247(3)(a), and as relevant here, the juvenile court in each county shall have jurisdiction of any juvenile who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian.

In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L., supra*. The purpose of the adjudication phase is to protect the interests of the child. *Id.* The Nebraska Juvenile Code does not require the separate juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. *In re Interest of Kane L. & Carter L., supra.* While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.* The State must prove such allegations by a preponderance of the evidence. *Id.* See, also, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 743, 936 N.W.2d 733, 742 (2020) ("'preponderance of the evidence' . . . is the equivalent of the greater weight of the evidence"; "greater weight of the evidence means evidence sufficient to make a claim more likely true than not true").

### 2. EVIDENCE FROM ADJUDICATION HEARING

At the adjudication hearing, all five witnesses who testified were called by the State. Joshua did not testify. Several exhibits were also received into evidence.

### (a) Police Officers' Testimony

Officer Aaron Lier from the Omaha Police Department testified that on February 10, 2022, he was dispatched to Joshua's home for a domestic disturbance. After arrival, Officer Lier was speaking to Joshua when Marlenna "came in from the street behind me"; she appeared "[a]gitated, scared, elevated."

Officer Lier spoke to Marlenna briefly in the street. She told him that she and Joshua had been drinking alcohol at a bar, they came back to the residence and an argument ensued. She said "'he had her on the ground, was holding her down, and she had a knife and started stabbing the ottoman in an attempt to get up,'" and Joshua "'grabbed her by the hair and threw her outside the residence onto the ground.'" Officer Lier did not observe "any injuries except old bruising all over [Marlenna's] body but it didn't look like it just occurred."

Officer Lier then spoke with Joshua inside of the residence. Joshua told Officer Lier that he had been at the house playing video games with friends, and once his friends left Marlenna "'kicked the door open'" and entered his residence. Joshua told her to leave, but she "'grabbed a knife from the kitchen, came out, threatened him with it, started stabbing the ottoman that's in the living room.'" Joshua decided to leave the residence and went to his room to grab his belongings and closed the door. Marlenna followed and "stabbed the door multiple times." (Marlenna told Officer Lier that the puncture marks to the door were old, not from that evening.) Officer Lier stated that Joshua told him that the altercation continued into the living room where Marlenna went at Joshua with a knife. He was able to grab her hand and get the knife away from her. She then

picked up a metal doorstopper and hit him in the forehead with it. Joshua was able to get the doorstopper away from Marlenna, "bear hugged her, and threw her outside."

Officer Lier observed the knife on the floor between the living room and dining room, the metal doorstopper on the floor, and "what appeared to be knife puncture wounds in the ottoman and in the bedroom door"; that bedroom was on the main floor of the home. Officer Lier also observed Joshua to have a large contusion on his forehead and scratch marks all on his torso and upper back, injuries Joshua said were caused by Marlenna.

Officer Lier learned from Joshua that his children were sleeping upstairs, and Officer Lier was able to observe the children in their bedrooms on the second floor of the home. Although it was concerning to Officer Lier that children were in the home during the altercation, he did not remove the children from Joshua's care that evening because it was determined that Marlenna was the primary aggressor and there was no indication that the children were in any danger that night or in need of immediate removal from the home. Additionally, Joshua had told Officer Lier that the children did not observe the altercation.

Officer Dominic Lombardo from the Omaha Police Department testified that on February 10, 2022, he was dispatched to Joshua's residence "to back [Officer Lier] up on a DV assault." When Officer Lombardo arrived at the residence, he spoke with Officer Lier, who had been on the scene for approximately 30 to 45 minutes. Officer Lier informed him that there had been some sort of an altercation between Joshua and Marlenna.

Officer Lombardo then spoke to Marlenna, who he described as "extremely distraught." He said she was "near manic, very elevated in her behavior," "had a disheveled appearance," "was missing her shoes," and "she was both screaming and crying and . . . almost laughing at the same time." Marlenna told Officer Lombardo that she had been assaulted by Joshua. She told him that she and Joshua had been at a bar earlier that evening, she had been drinking, won money playing Keno, and then they got into an argument about the way she was playing dominos. After they got back to the residence, she was scared and grabbed a knife and went into the back bathroom. Then a confrontation occurred; she "still has the knife and is thrown onto a couch, flails around with the knife and causes damage to that couch with the knife." Marlenna also told Officer Lombardo that she grabbed a type of pole and struck Joshua in the leg and in the head "defending herself." Marlenna appeared intoxicated when Officer Lombardo spoke to her. He observed markings on Marlenna's neck and face that appeared to be recent. He said, "I wouldn't classify them as a bruise . . . [or] a scratch," "[i]t was a combination of reddish mark and an abrasion, maybe." It was later brought to Officer Lombardo's attention that Marlenna had injuries under her clothing, and he then observed "bruising all over her body;" in his estimation, some of the bruising appeared to be "a couple of days old," and she had "bruising that was anywhere from a month to a week old."

Officer Lombardo learned from Officer Lier, that besides Joshua, there were also two children in the home at the time the incident occurred. Officer Lombardo was concerned because "[i]f a child is being exposed to this, it could have an adverse effect on them mentally." Officer Lombardo did not enter the residence, speak to Joshua, or observe the children that evening. But "[i]n that situation as [he] had been informed," Officer Lombardo did not believe the children were in immediate risk for harm "in that exact moment."

While in his cruiser at Joshua's residence, Officer Lombardo ran a criminal background check on Joshua; there was a "nonextraditable warrant" and "some other charges," but Officer

Lombardo did not recall seeing any charges similar to domestic violence or assault. Officer Lombardo also ran a criminal background check on Marlenna and said he "believe[d] she actually did have a prior DV charge." Additionally, Officer Lombardo ran an address search on the residence, and "recall[ed] seeing a couple of entries," but "[t]here was nothing significant at that time."

In response to the incident, Marlenna was arrested and booked for terroristic threats, domestic violence, second-degree assault, use of a weapon to commit a felony, and "DV" damage of property.

(b) DHHS Workers' Testimony

Ben Nore, a child and family services specialist with DHHS, testified that he became familiar with Preston and Maliyah on January 15, 2022. An intake was received on January 10, reporting that Marlenna's two children had been visiting the home of Marlenna and Joshua and while there, Marlenna's children witnessed Joshua slam Marlenna to the ground, push her against the wall, and put her head in the oven. Nore conducted an investigation based on the information contained in that intake and learned that Marlenna's children lived with their father, but Preston and Maliyah--who were not named in the January intake--resided in the home with Joshua and Marlenna.

Nore spoke with Marlenna's two children on January 15, 2022, at their father's home and as a result, had concerns about domestic violence and alcohol use in Joshua's home. Nore stated that Marlenna's children "had given specific details about incidents that were happening in the home while they were visiting [Joshua's] home," and indicated that Preston and Maliyah were present.

Nore then spoke with Preston at his school on January 19, 2022, but Preston's story was the opposite of what was reported by Marlenna's children. That same day, Nore also spoke with Maliyah at Joshua's home. When Nore arrived at Joshua's home, Marlenna answered the door and when Nore attempted to talk to her about the allegations in the report, Marlenna did not want to talk to Nore. He asked to see Maliyah to make sure she was okay, and Maliyah was brought to the front door. Nore only spoke to Maliyah briefly because Marlenna indicated that he could not speak to the children while Joshua was not home. It was concerning to Nore that he could not speak to the child without the presence of the parent because if he could not meet with Maliyah privately, "she would not feel free to disclose anything if there was something going on in the home."

Nore did speak with Joshua over the phone later that day on January 19, 2022. Nore stated, Joshua "discussed that he was not happy that I had pulled his child out of school . . . and that he wasn't present," and Joshua said "that if that's what CPS was going to do, then he would pull his kids out of the school and homeschool them." Nore felt that Joshua was limiting access to his children for DHHS to be able to discuss concerns of domestic violence in the home. Nore attempted to discuss the allegations contained in the intake and "[Joshua] did state that I saw his children and saw Marlenna and that nobody was being abused or beat up." Joshua eventually said to set up an appointment with his attorney to discuss the allegations further.

Nore reached out to Joshua's attorney on January 21, 2022, and a meeting was scheduled for January 24; however, the meeting did not occur because Nore was ill that day. Nore made attempts to reschedule by contacting Joshua's attorney on January 27 and 28; the attorney said he

would reach out to Joshua and try to schedule another appointment, but Nore did not hear back from the attorney. Nore reached out to the attorney via email on February 9 but did not receive a response. The attorney called Nore on February 11 to say that they would get a meeting set up on February 14; however, that meeting did not occur because when Nore reached out to the attorney on the morning of February 14 to verify a time and that the meeting was going to take place, the attorney said that he had not heard back from Joshua and that he was no longer his attorney.

Meanwhile, after speaking with the father of Marlenna's children on February 10, 2022, Nore reviewed the Nebraska Data Exchange Network and "learned that Marlenna was in jail on a second-degree felony domestic assault [and] felony terroristic charges." This was concerning to Nore because of the previous disclosures and concerns of domestic violence going on in Joshua's house. Nore reviewed the police report and learned that Marlenna had kicked in the door and gained access to the house, grabbed a knife after an argument with Joshua and used that knife to stab an ottoman and a door, and she used a metal doorstop to hit Joshua in the head. Nore also learned from the police reports that Marlenna had bruises all over her body in different stages of healing and that she reported her bruises were caused by Joshua and that domestic violence had been occurring for a period of time in the home. After finding out all this information, Nore was able to speak to Preston and Maliyah on February 15.

Nore spoke with Preston and Maliyah separately at their school on February 15, 2022. Both children told Nore that Marlenna was back in the home.

Nore also spoke with Joshua at his home on February 15, 2022, and Marlenna was also present in the home. Marlenna's presence was concerning to Nore based on the recent domestic violence and the fact that she was back in the home in violation of a no-contact order between her and Joshua; Joshua told Nore that he had bailed Marlenna out of jail the previous day. During his conversation with Joshua, Nore discussed his concerns about the domestic violence between Joshua and Marlenna and how that impacted the children and their immediate safety. Nore also expressed his concern that Marlenna was "right back in the home after she had been bailed out by [Joshua] in violation of a no-contact order." "Based on the escalation of domestic violence," Nore and Joshua discussed entering into a safety plan to address DHHS' concerns, however Joshua "stated that he was not going to enter into a safety plan with us or work with us." On cross-examination, Nore was asked if he specifically told Joshua that if he did not participate in a safety plan that the matter would be referred to the county attorney; Nore could not recall if he specifically said that to Joshua.

During his conversation with Joshua on February 15, 2022, Nore noticed the "smell of marijuana," and that Joshua's eyes were bloodshot, and he was slow in his responses; Nore was concerned because based on his conversations with Marlenna's children, Joshua's use of substances, such as alcohol and marijuana, made him more angry and increased violence toward Marlenna. After speaking with Joshua, Nore spoke to Joshua's sister via phone on February 15, and after speaking with her Nore was concerned about domestic violence and Joshua's substance use.

Nore next spoke to his supervisor, Kaitlin Hahn, about "next steps" and the two of them also "staff[ed]" it with an administrator. According to Nore, "A 'staffing' is a meeting between a worker, their supervisor, and administrator to discuss a case and the circumstances in our investigation and try to come up with a plan of how to proceed when we've identified a safety

threat and we feel the children remain unsafe in the home." After staffing, the conclusion was that Joshua would need to enter into a safety plan to not have Marlenna in the home, and to participate in services to address DHHS' concerns; if Joshua was not able to accomplish that, DHHS would submit an affidavit for removal of the children. Joshua was not willing to comply with a safety plan and Preston and Maliyah were taken into protective custody because DHHS opined that they were at risk for harm if left in Joshua's care.

Kaitlin Hahn testified that she is "one of the domestic violence supervisors for initial assessment" at DHHS and was the supervisor on this case. She said there were two intakes in this case, the first in January 2022 and the second in February, both regarding domestic violence and neglect in Joshua's home. Hahn oversaw and consulted with Nore during his investigation, and she had "a couple of conversations" with Joshua prior to the removal of Preston and Maliyah.

Hahn spoke with Joshua via phone on January 19, 2022. She explained to him that DHHS had an open investigation, and she expressed her concern for the domestic violence allegations. Hahn described Joshua's demeanor as "[i]rritated and frustrated" and said "[h]e reported that there should not be any concerns, and people shouldn't be able to just call the hotline when they want to." Joshua brought up his concerns about not wanting his children being taken out of class to be interviewed, and he also told Hahn that he no longer wanted to cooperate with the case. Hahn was concerned because it had been brought to her attention that Joshua was present (either in person or via telephone) when Nore spoke to Marlenna, and that Joshua had said that he would homeschool his children if the State had the right to interview the children at school. Hahn said, "As far as the domestic violence, we always want to be able to talk with the survivor, without the perpetrator present, to make sure that they are in a safe environment," and "one of the things we look at for child safety is if they are able to be seen and talked to by the general public, counselor's, teachers, that kind of thing."

Hahn next spoke with Joshua via phone and text on February 15, 2022. During their phone conversation, Joshua told Hahn that he no longer wanted to work with Nore because of Nore's interactions. Joshua reported that he pays his bills, his children are fine, and there was no reason for DHHS to have a case on him. Hahn said they discussed the police report that had been received regarding the incident of domestic violence for which Marlenna was arrested. Joshua told her that he did not want Marlenna to go to jail but he wanted her to get mental health help because she was struggling with not seeing her children from a previous relationship; Joshua did not want to have the court involved or charges pressed against Marlenna. After Hahn learned that Joshua was the one who bailed Marlenna out of jail, Hahn and Joshua discussed the "no-contact" order. Joshua explained to Hahn that the no-contact order says that he and Marlenna could not have contact, but she has to live at the home; Hahn told him that was something he would need to discuss with the county attorney. Joshua told Hahn that the children were not aware of the incident and that he and Marlenna never argued in front of the children. Hahn was concerned that Joshua was minimizing the incident that had occurred.

Hahn testified that during their text conversations on February 15, 2022, she explained to Joshua that she and Nore had staffed the case with their administrator, had identified a safety threat with the domestic violence, and wanted to implement a safety plan. Hahn stated, "I texted [Joshua] the details of what would be outlined in the safety plan, and he stated that he would go in front of the Judge because it was not needed." The details of the safety plan were that Joshua and Marlenna

could not have contact with each other in the presence of the children; for him to work with in-home services; for him to obtain an evaluation; for him to attend batterer's intervention; and for the children to have a therapist identified. On cross-examination, Hahn was asked if she informed Joshua that the matter would be referred to the county attorney's office if he did not participate in a safety plan. She replied, "Yes, I did," and she said that she had informed him "[v]ia text message." According to Hahn, a parent's lack of participation in a safety plan puts the children at risk for harm "[b]ecause they have to engage in the plan in order to protect their children."

Based on all the information gathered and Joshua's lack of cooperation with the safety plan, Hahn opined that Preston and Maliyah would be at risk for harm if left in Joshua's care. The children were ultimately taken into protective custody.

### (c) Preston's Testimony

Preston, 10 years old at the time of the adjudication hearing, testified that prior to their removal, he and Maliyah were living with Joshua and Marlenna. Preston did "[n]ot really" like living with Marlenna because "she was abusing," "[l]ike whacking me with an extension cord and grabbing me by my neck." Preston said Joshua was not there when it happened, and Preston did not tell Joshua about it because he "was scared [of] what [Marlenna] would do." When asked, Preston said that the extension cord incident occurred one time and it was "a long time ago," at their "old, blue house." But, "[Marlenna] grabbed me by my neck [or slapped me] a lot of times" at the "old, blue house and my house right now where my dad's living." When asked how long ago he was living at the old, blue house, Preston replied, "Probably like a year and a half -- no, like -- no, like six months [ago]"; it was "[l]ike summer" when they moved to the new house, and he was not in school when they moved.

On cross-examination, Preston said that Joshua was "[o]nly sometimes" home when Marlenna grabbed Preston by the neck or slapped him. When asked if Joshua saw it happen, Preston replied, "He'll say, 'There's nothing wrong.' And the TV was on; so he couldn't -- he wouldn't have heard me getting slapped." Preston was then asked, "So you don't think your dad ever saw Marlenna hurt you?"; Preston replied, "Yeah." However, on redirect, Preston was asked if Marlenna left marks on him when she grabbed or slapped him, and he said, "sometimes," "[w]hen she really got mad." He was then asked how often Marlenna left marks on him, and Preston replied, "A lot of times when she did it."

Preston observed Joshua and Marlenna argue "[l]ike every day," and when they argued "[t]hey [would] fight with hands and with objects." (On cross-examination, Preston said Joshua and Marlenna argued with words every day, and then at least two days a week they would also use hands.) Preston "sometimes" saw those things happen--"[l]ike two days of a week"--but "usually hear[d] them a lot." Preston "would be sleeping upstairs with [his] TV loud" so that he "[did not] have to hear them screaming." The incidents occurred at both the old and new house.

Preston was asked what he saw when Joshua and Marlenna fought with their hands. He replied, "Hitting and slapping and choking," and he confirmed that both Joshua and Marlenna did those things. When asked if he ever saw Joshua put his hands on Marlenna, Preston replied, "Yeah." Preston was then asked what would happen when Joshua put his hands on Marlenna; Preston said, "It was because she'd usually scream a lot." When asked if that made him feel scared, Preston responded, "Not really because he did that with a lot of his girlfriends." When Joshua and

- 8 -

Marlenna fought with objects, Preston said the objects were "[l]ike glass, whatever they can grab, whatever they're near" and they would "hit" with it or "throw it." When asked if Marlenna would do that to his father, Preston replied, "Yeah," "[b]ut my dad never grabbed objects." On cross-examination, Preston said Joshua "[is] super strong," "[h]e doesn't need [an object]."

Preston testified that Joshua "used to spank us with a belt" when they were in trouble, but "[h]e stopped doing that because there was neighbors in our windows [sic] and not as much soundproof," and Joshua usually had the window open. Preston said that this happened at the new house, and that Joshua "used to hit me with a belt way more at my old, blue house." (On cross-examination, Preston said that Joshua only used his hands to spank him at the new house.) After Joshua stopped spanking Preston, Preston would have to run laps in the yard if he got in trouble.

According to Preston, Joshua drank "a lot" of alcohol, "[l]ike six beers a day" or "sometimes even more when he's at home"; he would drink when both Preston and Maliyah were in the home. Preston said that when Joshua drank, Joshua "could hardly even talk," "[h]is words sound, like, super funny," and that it would cause arguments with Marlenna. On cross-examination, Preston was asked how he knew how many beers a day Joshua would drink; Preston replied, "Because Marlenna used to say it." Preston said Joshua would drink glass bottles and cans of beer, but "[h]e's not there that much because he went to the bar a lot of times." Preston knew Joshua was at the bar because Marlenna said so. She "gets mad when [Joshua's] not over there with all of us or us two because he's supposed to be there because it's not her responsibility to take care of us because . . . it's his kids." When Joshua drank, he would "like, spin around a little," "like, dizzy." When asked if Joshua, after drinking, ever drove him anywhere, Preston said Joshua would drive him and Maliyah to one of their uncles' houses; Joshua also drank in the car while driving, he would "take sips at the stop signs or red lights."

Preston recalled speaking with Nore at school but said he would have gotten in trouble if he told Nore the truth. Preston said, "[I]f I did tell the truth to [Nore], at the end, he calls my dad and he would tell my dad I told the truth, what we said, and then we would have got in trouble [with my dad]." Preston said Joshua told him, "'Don't tell the truth to [Nore],'" "'[d]on't say what's happening at home.'"

When asked if he felt safe when he was living with Joshua, Preston replied, "Not really," "because [Joshua and Marlenna] argued way too much." Preston was also asked if he wanted to go back to Joshua's house. Preston said, "No," "[b]ecause he's scary when he gets mad" and "he will hit us with a belt on our butts."

### 3. SUFFICIENCY OF EVIDENCE

As stated earlier in this opinion, to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). And while the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id.*

In its petition, the State alleged that Preston and Maliyah were children within the meaning of § 43-247(3)(a) because they lacked proper parental care by reason of the faults or habits of

Joshua. The State specifically alleged that or about February 10, 2022, law enforcement responded to the family home for a domestic disturbance; Joshua engaged in domestic violence in the family home, placing the children at risk for harm; Joshua failed to take reasonable steps to protect the children from domestic violence; Joshua failed to cooperate with DHHS' investigation into the safety and well-being of the children; Joshua's use and/or possession of alcohol and/or controlled substances placed the children at risk for harm; Joshua failed to provide proper parental care, support, supervision, and/or safety to the children; Joshua failed to provide safe, stable, and/or appropriate housing to the children; and due to the above allegations, the children were at risk for harm.

Joshua argues that there was insufficient evidence to prove each of the individually specified allegations in the petition. We disagree.

Law enforcement officers responded to Joshua's home on February 10, 2022, after a physical altercation between Joshua and Marlenna. While law enforcement did not remove the children from Joshua's care that evening, it was because they determined that Marlenna was the primary aggressor and she was arrested and taken into custody, and the children had been upstairs sleeping during the altercation. The officers were not aware of the previous domestic violence in the home, or the fact that Joshua would later bail Marlenna out of jail and allow her back in the home.

The altercation on February 10, 2022, was not the first altercation between Joshua and Marlenna. There had been a previous intake regarding domestic violence in January, and during the February altercation, Marlenna was observed with old bruising, and she said that Joshua had assaulted her. Preston testified about repeated instances of domestic violence between Joshua and Marlenna. Preston also testified that Joshua's alcohol use led to arguments between Joshua and Marlenna, and he had previously testified that sometimes the arguments became physical. Preston observed physical altercations and heard numerous arguments between Joshua and Marlenna in both the old house and the new house. Preston also testified that he was grabbed and slapped by Marlenna, and that she sometimes left marks on him.

Additionally, Nore and Hahn testified that Joshua did not want the children interviewed outside of his presence, and he even went so far as to say he would homeschool the children if the State could interview them at school. Nore's attempts to schedule a meeting with Joshua via his attorney were unsuccessful. And Preston testified that Joshua told him not to tell Nore the truth and not to talk about what was happening at home. Based on this evidence, we find that Joshua failed to cooperate with DHHS' investigation. Both Nore and Hahn testified that Joshua was not willing to enter a safety plan; this remained true even after Hahn informed Joshua that the matter would be referred to the county attorney's office if he did not participate in a safety plan.

While there was no concern about the physical structure of Joshua's home or the availability of food in the home, that does not mean the children were provided proper parental care, support, supervision, and/or safety; nor does it mean they were provided a safe, stable, and/or appropriate housing. The evidence at the adjudication hearing showed that Joshua engaged in domestic violence in the home, Preston and Maliyah were exposed to the domestic violence, and Joshua failed to protect them from domestic violence. Joshua also failed to cooperate with DHHS' investigation or engage in a safety plan. All those things placed the children at definite risk for

- 10 -

harm. Based on our review of the record, we find by a preponderance of the evidence that the children were within the meaning of § 43-247(3)(a) by the reason of the faults of habits of Joshua.

## VI. CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court adjudicating Preston and Maliyah.

AFFIRMED.